## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

LELCHOOK, et al.,

        Plaintiffs,

                                          Civ. No. 15-13715(PBS)

    v.

THE ISLAMIC REPUBLIC OF IRAN, et al.,

        Defendants.


### DECLARATION OF PATRICK L. CLAWSON

I, Patrick L. Clawson, PhD, of the city of Washington in the District of Columbia, this 31st day of May, 2016, declare pursuant to 28 U.S.C. § 1746, as follows, subject to penalties of perjury:

### A.　Professional Background

1.　I am an expert on the Islamic Republic of Iran ("Iran") and have extensively studied and researched Iran and its sponsorship of terrorism, its economy, and its politics.

2.　I am the Director of Research at the Washington Institute for Near East Policy ("The Washington Institute"), where I have been employed since 1997. My previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.  Most of my professional life has been spent studying the Middle East, in particular, Iran.  My first scholarly

article on the Middle East was published approximately thirty-five years ago, and my first work on the region for the Central Intelligence Agency was approximately twenty-five years ago.

3.     The Washington Institute is a think tank, in other words, a 501(c)(3) organization, which receives funding from a variety of individuals, all of whom are American, to conduct studies about U.S. foreign policy interests and concerns in the Middle East.  As part of that work, the Washington Institute studies domestic and international issues relating to the Iranian government.  My work includes extensive research regarding the Iranian Ministry of Intelligence and Security ("MOIS"), the Iranian Revolutionary Guard Corps (the "IRGC") and its Qods Division ("IRGC Qods") and the Iranian financial and banking system.

4.     As Director of Research at The Washington Institute, my duties include, *inter alia*, supervising a staff of about twenty senior researchers who study Middle East politics and terrorism, with considerable focus on Iran.  Some of these researchers are well known for their expertise in the Middle East. For example, I have worked with Dennis Ross, President Clinton's Middle East Envoy and chief peace negotiator from 1993-2000 and President Obama's Special Assistant to the President and Senior Director of the Central Region (covering the Middle East) at the National Security Council from 2009-2013. I have also worked with former Deputy Assistant Secretary of the Treasury for Intelligence Matthew Levitt, responsible, *inter alia*, for following Iranian terror financing; and former Deputy Assistant Secretary of State, Scott Carpenter, who worked on Middle East reform programs. Under my supervision, the Washington Institute's researchers have written more than twenty studies about Iran's security apparatus, support for terrorism including terror financing, political leadership, and U.S. and Western policies to counter Iranian terrorism and terror financing. I also regularly brief and receive

briefings from senior United States military officials and senior officials of other governments friendly to the United States, about the threats from Iran, Iranian support of terrorism and Iranian strategy regarding terrorism.

5.      Over the last twenty-nine years, I have done contract consulting work on Iran for several U.S. government agencies, including the Central Intelligence Agency, the Defense Department, the State Department Bureau of Intelligence and Research, and through various contractors, the National Security Agency and the Defense Intelligence Agency.  While at the National Defense University, I worked closely with officials from a wide range of U.S. government agencies on the issue of Iran and Iranian support for terrorism, including close work with the Central Command (the U.S. military command responsible for the Middle East) and its subordinate commands, and with the staff of the Joint Chiefs of Staff.

6.      I have previously been designated and qualified by federal courts as an expert witness on issues relating to Iran, Iran's support for terrorism, its economy and other issues, and have given both live and written testimony in various cases brought against Iran for its sponsorship of terrorism, including *Cicippio v. Islamic Republic of Iran*, 18 F. Supp.2d 62, 68 (D. D.C. 1998); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stehem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);  *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No.

3

00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at * 3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan*, et al., No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), among others.

7.     I have also testified before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees about Iran, Iranian terrorism, and the use of economic measures to discourage Iran from supporting terrorism.

8.     I have made presentations about the foreign and economic policy of Iran, including its support for terrorism, and about U.S. policy towards Iran at conferences sponsored by, amongst other organizations, the Iranian Foreign Ministry's Institute for Political and International Studies in Tehran, Iran, the Royal Institute for International Affairs in London, UK, the Royal United Services Institute in London, UK, the Japanese Foreign Ministry in Tokyo,

4

Japan, the Institute for Defense Studies and Analysis in New Delhi, India, the Shanghai Institute for International Studies in Shanghai, China, the Jaffee Center of Tel Aviv University in Tel Aviv, Israel, the Council for Foreign Relations in New York City, New York, the Nixon Center (part of the Nixon Presidential Library) and the Carnegie Endowment for International Peace in Washington, D.C., and a great many universities. I have given presentations concerning Iran at more than 200 symposiums in more than twenty countries.

9.      My books and monographs include: *How Iranians Might React to a Nuclear Deal* (The Washington Institute, 2014, with Mehdi Khalaji); *An Iranian Nuclear Outbreak is Not Inevitable* (The Washington Institute, 2011); *The Red Line: How to Assess Progress in U.S. Iran Policy* (The Washington Institute. 2010); *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Policy* (The Washington Institute, 2010); *Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute, 2010); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventative Military Action Against Iran* (The Washington Institute, 2008, with Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College, 2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the flagship annual report of the Institute for National Strategic Studies of the National Defense University, which I inaugurated and edited for three years, 1995-1997); *U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997); *Business as Usual? Western Policy*

*Options Towards Iran* (American Jewish Committee 1995); *Energy Security in the Twenty-First Century* (National Defense University Press, 1995, edited); *Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited); and *Iran's Challenge to the West: How, When, and Wh*y (the Washington Institute for Near East Policy, 1993).  The book I co-authored with Rudi Matthew and Willem Floor, *The Monetary History of Iran: From the Safavids to the Qajars*, was awarded the Houshang Pourshariati Iranian Studies Book Award for the best book about Iran in 2014 from the Middle East Studies Association, the organization of U.S. scholars studying the Middle East.

10.     In addition I have written about the contemporary Middle East, including about Iran, for a variety of news publications, including The New Republic, The New York Times, Wall Street Journal and Washington Post.  I have also authored more than forty scholarly articles for academic publications, such as Foreign Affairs, Survival, Washington Quarterly, International Journal of Middle East Studies, Middle East Journal, Les Cahiers de l'Orient and Oxford Bulletin of Economics and Statistics.

11.     From 1995 to 2012, I was senior editor of Middle East Quarterly, a journal of Middle Eastern affairs, which regularly publishes on Iranian politics and Iran's foreign policy. From 1990 through 1994, I was editor of Orbis, a foreign policy journal.

12.     I hold a Ph.D. in economics from the New School for Social Research and a B.A. from Oberlin College.

13.     I am able to read and/or speak Persian and French as well as some Hebrew, Spanish, and German. I read the Iranian press regularly through the internet. I also read other publications from Iran, including books in Persian.

14.     A copy of my CV is attached hereto as Exhibit A.

**B.      Nature of This Expert Witness Report**

15.     I have been asked by counsel for plaintiffs in the case of *Lelchook, et al. v. The Islamic Republic of Iran*, *et al.*, Case No. 15-13715 (PBS) (D. Mass.), to provide my professional opinion as to the role of Bank Saderat PLC in transferring funds from the Iranian government to Hezbollah between 2001 and 2006 and whether Bank Saderat PLC's actions in this regard were carried out in furtherance of official Iranian policy to target the United States.

16.     My knowledge of Iran's sponsorship of terrorism and its use of its banking system for that purpose comes as a result of my routine and in-depth access to facts concerning Iran, its support of terrorism, its economy and politics and my extensive study of Iran as outlined herein, including my professional research and publishing in this field over the course of many years. Indeed, as part of my work, I spend at least one hour a day reviewing writings, including online sources, relating to Iran and other nations that sponsor terrorism.  Iran is a relatively open information country in which the competing political forces frequently reveal information about the country's security apparatus and debate issues relating to terrorism.  Iran even has many internet sites that publish information on these subjects.  From my years studying Iranian politics and given the competing sources that can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible.  Indeed, I use this information as a source to brief the United States and other governments.  Furthermore, Iran and some of the terrorist groups it sponsors have been openly boastful about their relations, and have described and detailed their connections in print.

7

17.     Nevertheless, Iranian media are strictly regulated by the Iranian government. The Committee to Protect Journalists lists 30 imprisoned journalists in Iran, more than any country in the world except China.[1]  From leaks, it is known that the Iranian government issues official instructions about topics which cannot be discussed.  The lack of coverage in the Iranian media about Iran's financial relationship with Hezbollah and other terrorism groups, or even of U.S. accusations about deceptive practices by Iranian financial institutions, strongly suggest that coverage of these issues is forbidden.  Be that as it may, I am unaware of useful material from Iranian sources about terrorism financing by the Iranian government or activities of the Iranian banks in this regard.

18.     My opinions set forth below are based upon my education, research, and experience as well as my review and analysis of documents and sources typically relied upon by experts in my field.   Such documents and sources include, but are not limited to: official speeches made by Iranian officials, U.S. officials, and the officials of other countries, my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English-language press and Persian language press).

## C.     Background Concerning Iran and Hezbollah

19.     In 1979, the Islamic Republic of Iran came to power both through a popular revolution and then through a series of referenda.  This government replaced the previous regime, which was headed by Shah Mohammad Reza Pahlavi. From the beginning, the Islamic

---

[1]  See https://cpj.org/imprisoned/2014.php.

Republic of Iran's political and religious institutions were overseen by a single person, a religious leader who is called "the Supreme Leader." The Iranian Constitution provides that the Supreme Leader has the authority to dismiss the Iranian President, overrule the parliament and the courts, and overrule any secular law. In addition, the Supreme Leader is imbued by the religious community with the authority to overrule any religious law if necessary for the "expediency of the system." Indeed, under the Constitution, the Supreme Leader appoints an Expediency Council to advise and assist him in overriding any law, civil or religious, which is found inexpedient. At the time of the 1979 revolution, Ayatollah Ruhollah Khomeinei was the Supreme Leader. Currently, the Supreme Leader is Ayatollah Ali Khamenei. He is the only person, other than Ayatollah Khomeinei, ever to hold the title of Supreme Leader. The Supreme Leader is not popularly elected. He is chosen by an "Assembly of Experts," the members of which, in theory, are popularly elected. In fact, however, all candidates for the Assembly of Experts must be approved by the previous Supreme Leader.

20.     Iran has used state support for terrorism continuously since 1979. One of the major ways that Iran supports anti-American terrorism is through Hezbollah. Hezbollah's origins date to 1982, shortly after the 1979 Iranian Revolution, when Israel invaded Lebanon. Iran secretly instructed its most fervent supporters to form a clandestine organization within Amal, then the main organization in the Shiite community. At first, the Iranian supporters used a variety of names to hide their activities, such as kidnapping Americans and other Westerners. But by 1985-86, Hezbollah openly acknowledged its existence, presenting itself as more radical and more pro-Iranian than Amal. The two fought a war in 1988, which Hezbollah won, cementing its position as the main Shiite organization. During the period of its formation from

1982 through 1988, Hezbollah had few means of financial support other than aid from Iran. In the last 25 years, Hezbollah has been able to parlay its military might into control over criminal enterprises, such as drug smuggling, and commercial activities such as television stations. Hezbollah continues to receive from Iran substantial financial and military aid, and the organization has remained highly responsive to Iranian directives even when those go against Hezbollah's own interests. One reason is that Hezbollah's appeal to its hard-core supporters is as the ideological embodiment of the revolutionary values represented by the Islamic Republic of Iran.

21.     Indeed, from its inception until today, Hezbollah has carried out many attacks against U.S. targets in furtherance of Iran's openly stated anti-American policies, such as the 1983 bombing of the U.S. Marine barracks in Beirut or the many kidnappings of Americans in Lebanon in the 1980s, both before and after the "Iran-contra" affair in which the United States secured the release of some hostages by negotiating with the Iranian government. Other notable episodes involving Americans include the 1996 bombing of the Khobar Towers barracks in Saudi Arabia. The National Commission on Terrorist Attacks upon the United States (usually called the 9-11 Commission) concluded, "In sum, there is strong evidence that Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11, and that some of these were future 9/11 hijackers. There also is circumstantial evidence that senior Hezbollah operatives were closely tracking the travel of some of these future muscle hijackers into Iran in November 2000… We believe this topic requires further investigation by the U.S. Government."[2]   As

---

[2] http://govinfo.library.unt.edu/911/report/911Report.pdf,  p 241.

discussed below, Iran also sponsored attacks in Iraq which killed U.S. soldiers during the fighting there after 2003.

22.     Hezbollah was designated by the U.S. State Department as a "foreign terrorist organization" (FTO) in accordance with section 219 of the Immigration and Nationality Act (INA) as amended when the list was first issued on October 8, 1997 and remains on the list of FTOs.[3]   The FTO list was mandated by the Antiterrorism and Effective Death Penalty Act of 1996 which, in the words of the U.S. Justice Department, "gave the Secretary of State authority to designate foreign terrorist organizations whose terrorist activity threatens the security of United States nationals or the national defense, foreign relations or economic interests of the United States."[4] Hezbollah has also been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995 and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001. In addition, because of continuing concerns about Hezbollah's activities, in 2015 Congress passed, and the President signed, the Hizballah International Financing Prevention Act, Public Law 112-102, Title I of which is "prevention of access by Hizballah to international financial and other institutions."

23.     In short, Hezbollah was founded at Iran's direction, has always received substantial assistance from Iran, and has always been highly responsive to Iranian government directives. Iran provides essential financial support to Hezbollah and did so prior to and during

---

[3] http://www.state.gov/j/ct/rls/other/des/123085.htm

[4]     https://www.justice.gov/usam/criminal-resource-manual-16-providing-material-support-designated-terrorist-organizations.  On this matter, that web page references Pub. L. 104-132, § 302, 110 Stat. 1214, 1248 and section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189)

the Hezbollah rocket attacks on Israeli civilians during the summer of 2006.[5] This support has significantly increased Hezbollah's military capabilities, and assisted Hezbollah in the destruction it inflicted upon Israel's civilian population during the summer 2006 rocket attacks.

24.    As a result of Iran's official policy of supporting terrorism against the United States, Iran is now, and since 1985, has been continuously listed on the U.S. State Department list of state sponsors of terrorism. The Secretary of State is required under U.S. law to provide Congress with an annual full and complete report on terrorism with regard to those countries and groups meeting criteria set forth in Title 22 of the United States Code, Section 2656 f(a) (requiring the Department of State to provide Congress with a full and complete annual report on terrorism for those countries and groups meeting the criteria of Sections (a)(1) and (2) of the Act).   The list is set forth in an annual report called "*Patterns of Global Terrorism*" or more recently "*Country Reports on Terrorism*" (referred to herein as "Patterns of Global Terrorism"). Patterns of Global Terrorism is highly respected by researchers on terrorism, since the State Department has access to reliable intelligence sources not available to the general public and puts considerable effort into the document, making sure to double check and verify all facts and weighing each word carefully. Patterns of Global Terrorism reports frequently refer to Iran's role as a sponsor of terrorism and to its support for Hezbollah.

---

[5] Indeed many U.S. Courts have found that Iran has been providing material support to Hezbollah in the form of millions of dollar in financing and weapons since the 1980's. *See Kaplan v. Hezbollah*, 55 F. Supp.3d 189, 197 (D.D.C. 2014); *see also, e.g., Oveissi v. Islamic Republic of Iran*, 879 F. Supp.2d 44, 53 (D.D.C. 2012); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp.2d 136, 153 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran*, 664 F. Supp.2d 43, 54 (D.D.C. 2009); *Ben Rafael v. Islamic Republic of Iran*, 540 F. Supp.2d 39, 47 (D.D.C. 2008); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp.2d 27, 43-44 (D.D.C. 2001); *Polhill v. Islamic Republic of Iran*, 2001 WL 34157508, at *4 (D.D.C. Aug. 23, 2001); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000).

**D.   The United States Government Has Confirmed That Iran Uses its Banks to Support Terrorism**

25.     Statements by U.S. government officials, like the ones discussed below, are particularly reliable and are widely relied upon by scholars and policymakers.  The Treasury Department has created a large structure headed by the Under Secretary for Terrorism and Financial Intelligence to follow terror financing, with two assistant secretaries, each with substantial staff, and two other large bureaucracies (the Financial Crimes Enforcement Network or FINCEN and the Office of Foreign Assets Control or OFAC which enforces sanctions).  This structure, which is part of the U.S. intelligence community, has access to all the intelligence assets of the U.S. government, including signals intercepts and intelligence from informers.  It has the deserved reputation of being cautious and careful about its designations and public statements; indeed, some commentators and members of Congress complain that it is too slow to act.  In private conversations, Treasury officials explain that they place high priority on developing sufficiently detailed and well-documented dossiers so that the U.S. government has high confidence its judgments will stand up in court if challenged, with the result that sometimes the U.S. government spends years internally debating before a statement is released characterizing some entity as involved in terror financing.  Such statements are typically relied upon by Iran and terrorism experts in their research, and I myself routinely rely upon such statements in my research.

26.     At a Press Roundtable in Germany on July 12, 2007, U.S. Under Secretary of the Treasury for Terrorism and Financial Intelligence, Stuart A. Levey, explained:

> The [Iranian] regime does ***use its banks*** to pursue not only its proliferation ambitions but also its funding of terrorism … we in the United States have taken action against Bank Saderat for its role in funneling money from the Central Bank of Iran to terrorist

13

> organizations [including] Hezbollah … ***Iran not only uses its banks for that purpose, but also its banks engage in deceptive practices in order to engage in that business***.[6]
> [all of the emphasis in this paragraph added]

(emphasis added). Under Secretary Levey testified similarly before the United States Congress on April 1, 2008, correctly stating that "Iran uses its state-owned banks … for financing terrorism."[7]

27.     Moreover, as a direct result of the deceptive financial practices described by Under Secretary of the Treasury Levey, the U.S. Government subjected Iranian banks, including BSPLC, to sanctions pursuant to the International Emergency Economic Powers Act ("IEEPA"). Deputy Assistant Secretary of Treasury for Terrorism Financing and Financial Crimes Daniel Glaser provides a good summary of these sanctions in his April 17, 2008 testimony before the House Committee on Foreign Affairs Subcommittee on the Middle East and South Asia and Subcommittee on Terrorism, Nonproliferation and Trade.   Consistent with the statements of Under Secretary of the Treasury Levey, Glaser explains the basis for the sanctions, as follows:

> Iran uses its global financial ties to pursue both the threat of terrorism and a nuclear program through an array of deceptive practices specifically designed to avoid suspicion and evade detection from the international financial community.... ***[One] method Iranian banks use to evade controls is to ask other financial institutions to remove their names when processing transactions through the international***

---

[6] See 7/12/07 Press Roundtable with Under Secretray of the Treasury Stuart A. Levey, available at http://germany.usembassy.gov/levey-roundtable.html.

[7] See 4/1/08 Under Secretary for Terrorism and Financial Intellignece Stuart A. Levey, Testimony Before the Senate Committee on Finance, available at http://www.finance.senate.gov/imo/media/doc/040108sltest.pdf

14

> ***financial system....*** This practice is even used by the Central Bank of Iran to facilitate transactions for sanctioned Iranian banks.[8]

(emphasis added).

28.     In a March 2008 Advisory, the Department of the Treasury Financial Crimes Enforcement Network (FinCEN) similarly stated:

> Through state-owned banks, the Government of Iran disguises its involvement in … terrorism activities through an array of deceptive practices specifically designed to evade detection*. **The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction** [emphasis added] … The U.S. Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned Iranian banks.[9]

29.     In a June 22, 1010 Advisory, FinCEN reinforced this stating:

> The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to supplement information previously provided on the serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran, and to provide guidance to financial institutions regarding United Nations Security Council Resolution (UNSCR) 1929, adopted on June 9, 2010....[10]

30.     On November 21, 2011, the U.S. Department of the Treasury issued a finding which, in the words of the Treasury Department press release of that date:

---

[8] See 4/17/08 Testimony of Daniel Glaser before Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, available at http://www.iranwatch.org/sites/default/files/glaser-prepared-041708.pdf

[9]     See 3/20/08 Advisory, Department of the Treasury Financial Crimes Enforcement Network, available at https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-a002.pdf.

[10]     See 6/22/2010 Advisory FIN-2010-A008, Department of the Treasury, Financial Control Enforcement Network, "Update on the Continuing Illicit Finance Threat Emanating from Iran ," available at https://www.fincen.gov/statutes_regs/guidance/pdf/fin-2010-a008.pdf.

15

identified the Islamic Republic of Iran as *a jurisdiction of primary money laundering concern* under Section 311 of the USA PATRIOT Act (Section 311) based on Iran's support for terrorism; pursuit of weapons of mass destruction (WMD); reliance on state-owned or controlled agencies to facilitate WMD proliferation; *and the illicit and deceptive financial activities that Iranian financial institutions* – including the Central Bank of Iran – and other state-controlled entities engage in to facilitate Iran's illicit conduct and evade sanctions.[11]

(all emphasis in this paragraph added).[12]

31.    The Section 311 Patriot Act finding affected all Iranian banks.

**E.    The Response of BSI and BSPLC to US Sanctions For Their Transfers of $50 Million to Hezbollah Shows That the Banks Operate to Further Iran's Interests Even if Against Their Own Economic Interests**

32.    Plaintiffs allege in the complaint in this case that the defendants, including BSI and BSPLC, transferred $50 million to Hezbollah "with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out terrorist attacks against American and Israeli targets in order to advance Iran's Policy and Goals." Compl. at ¶ 100. This is an accurate statement for the reasons discussed below.

33.    Iran is an authoritarian state which uses its state owned and/or controlled entities, including BSI and BSPLC, to support and advance its policies and goals. As such, banking institutions in Iran are regulated and supervised by agencies controlled by the Iranian government. Indeed, the Iranian Revolutionary Constitution of 1979 provides that all Iranian

---

[11]    See 11/21/11 U.S. Department of the Treasury Press Release, available at http://www.treasury.gov/press-center/press-releases/Pages/tg1367.aspx.

[12]    Treasury never finalized the November 21, 2011 proposed designation of Iranian banks, including CBI, under the USA PATRIOT Act's Section 311 for a variety of reasons, including subsequent Congressional action concerning sanctions on CBI which in effect made the proposed designation moot.

banks are to be "owned publicly and administered by the state."[13] In recent years, the government has re-interpreted this provision to allow private and semi-private banks under the tight supervision and control of the Central Bank of Iran ("CBI") as described in the annex, Relationship of Iran's Central Bank to the Iranian Government.  But as the Research Division of the Library of Congress has correctly noted, all state and private banks in Iran are "strictly overseen by the Central Bank of Iran."[14] On its website, the CBI admits that Iranian banks adhere to the Iranian government's policies, stating "[a]fter the Islamic Revolution of Iran laws and regulations pertaining to money and banking institutions and monetary policy design and implementation were amended *to reflect the priorities and principles as set out in the Constitution of the Islamic Republic of Iran*." (emphasis added).[15] In a December 2005 speech, then-President Mahmoud Ahmadinejad confirmed the ideological mandate of Iran's banks, including BSI and BSPLC, stating that the "glory, identity, independence and future progress of the country is greatly dependent on" Iran's banks, and emphasizing that the "glory" and "identity" referred to the ideals of the Islamic Revolution.[16]

34.     Both by law and in practice, the CBI is the Iranian government's banker.[17] Government revenue is deposited in the CBI; government expenditures are carried out through

---

[13]   *See* 2/23/01 Country Reports on Human Rights Practices for Iran, available at http://www.state.gov/j/drl/rls/hrrpt/2000/nea/786.htm.

[14]   *See* May 2008, Country Profile: Iran, Library of Congress – Federal Research Division, available at http://www.loc.gov/rr/frd/cs/profiles/Iran.pdf.

[15]   *See* http://www.cbi.ir/page/GeneralInformation.aspx

[16]   *See* http://www.cbi.ir/showitem/2792.aspx

[17]   I am aware of one court that has found that the CBI is not engaged in typical "central banking activities." *See Peterson v. Islamic Republic of Iran*, 2013 WL 1155576, at *26 (S.D.N.Y. March 13,

the CBI. The relationship between the CBI and the government, analyzed in the annex on Relationship of Iran's Central Bank to the Iranian Government, is even closer than specified in law or recommended by economists.

35.     The government misuses the CBI in ways contrary to Iranian law and to good economic practice, for ideological reasons. For example, the Iranian government uses the CBI to ensure how credit is allocated; that is, the Council of Ministers issues orders about how the CBI will administer credit policy, including to which sectors the CBI will extend loans.  This has had some disastrous effects on the Iranian economy. The 2014 IMF report about Iran's economy states that at end-2012, the CBI had extended more than $35 billion in loans to the Bank Maskan (Housing Bank) for the Mehr housing program for low-income families. Press reports suggest that many of the Mehr-funded developments are of poor quality and those living in them have no means to repay. As the IMF delicately phrased the matter: "To avoid any future pressure on the CBI for further financing and increase transparency of the fiscal accounts, the authorities should consider including the project in the annual budget and finance it through budgetary resources" – a polite way of saying these loans will not be repaid.[18]

36.     Like all Iranian banks, Bank Saderat Iran ("BSI") was nationalized in 1979 by the new revolutionary government and remained under undisputed government ownership until

---

2013). The Second Circuit Court of Appeal's decision was recently upheld by the U.S. Supreme Court; the issue of the character of the CBI's activities was not a matter at dispute.

[18] IMF, Islamic Republic of Iran -- Staff Report for the 2014 Article IV Consultation, https://www.imf.org/external/pubs/ft/scr/2014/cr1493.pdf, p 13.  An example of press reporting about the scheme is Marketa Hulpachova "Iran's economy struggles to support Ahmadinejad's ill-conceived housing vision, *Tehran Bureau*, January 30, 2014, http://www.theguardian.com/world/iran-blog/2014/jan/30/irans-economy-struggles-to-support-ahmadinejads-ill-conceived-housing-vision.

sometime in 2009.[19]   Moreover, it is overseen by the CBI, which is controlled by the Iranian government. Accordingly, the Iranian government makes sure that the policy decisions of BSI (like all Iranian banks) reflect and advance the policies and goals of the government of Iran.[20]

37.   At all times, including the period during which it carried out the transfers to Hezbollah, BSI  (and its wholly-owned subsidiary BSPLC) acted to advance the policies and goals of the government of Iran, including its policies and goals vis-à-vis Hezbollah and its terrorist activities targeting the United States.

38.   This is confirmed generally by BSI Chairman, Seyed Mohammad Jahromi, in BSI's 2009-2010 Annual Report, where he said "After banks were nationalized, their policy making system was assigned to the government and banks had little authority over decision-making."[21] Given that BSI's policy making system was assigned to the government," that means BSI's "policy-making system" was assigned to support the goals of the Iranian revolution, which included material support for terrorism.

39.   *LA Times* journalist, Borzou Daraghi, also confirmed this specifically with respect to BSI in a September 10, 2006 article in which he wrote:

> Overt Iranian funding comes through Bank Saderat, a state-owned import-export bank that arrived in Lebanon in the early 1960s and expanded its

---

[19]   Bank Saderat 2009-2010 Annual Report, which is available on its website in English and in Persian. http://in.bsi.ir/PortalData/Subsystems/StaticContent/uploads/Image/En/File/BSI-2010-2011.pdf.

[20] Even assuming that the finding in *Flatow v. The Islamic Republic of Iran*, 308 F. 3d 1065 (9th Cir. 2002) about the level of control the Iranian government exerted over BSI in an earlier time period is correct (an issue about which I do not opine), it is not relevant here. The issue here is not whether Iran exercises day-to-day control over BSI and BSPLC, but that Iran's control and power over these banks are sufficient to have caused them to adopt policies and take actions to further Iran's foreign policy goals.

[21]   *See*   http://www.bsi.ir/en/Financial%20Report/Annual%20Report%202009-2010/Annual-report.pdf

19

presence there during the 1990s, opening branches in the Bekaa Valley and the south.

***The bank was used as a tool to further Iran's foreign policy goals in Lebanon***, disbursing funds for charities, social services and several networks of schools, said a former financial services industry professional and scholar who has studied Saderat's operations.[22]

(emphasis added).

40.     BSI is the only Iranian-owned bank in Lebanon. The BSI-Lebanon website, www.bsi-lebanon.com/history.html, states that BSI's Lebanon operations are a branch of BSI, established in 1963. BSI has several branches in Lebanon, including several in Hezbollah-controlled areas. The governor of the Lebanese Central Bank, Riad Salameh, explained in a 2012 interview that "Bank Saderat of Iran has $137 million in funds."[23] He also said only $16 million of those funds were from deposits. This account would be consistent with the activities of a bank which handles large cash transfers. The *LA Times* article about Hezbollah's influence notes that BSI in Lebanon appears to function primarily as a means to transfer funds.  The article states, "Saderat practices none of the traditional banking activities in Lebanon: There are no ATMs or gifts for opening savings accounts. Its assets totaled a modest $101 million in 2004. Yet at times its receipts have careened off the map, the former [banking] industry professional said."[24] In short, during the relevant period, BSI was well positioned to handle transfers from the Government of Iran to Hezbollah.

---

[22] Daraghi, Borzou, The Roots of Hezbollah's Clout Lie in Iran, 09/10/06, *LA Times*, available at http://articles.latimes.com/2006/sep/10/world/fg-lebiran10.

[23] https://now.mmedia.me/lb/en/reportsfeatures/tolerated_but_not_trusted.

[24] *See* Daraghi, *supra*.

41.     BSPLC is self described as a wholly owned subsidiary of BSI.[25] According to the BSPLC website, BSPLC was formed in 2001 by the consolidation of six Iranian banks in London ("all effectively State owned," according to the website), under the 100% ownership of BSI.[26] Indeed in a case that was recently before the EU Court of Justice, BSPLC used its status as a wholly owned subsidiary of BSI to argue for application of the same sanctions status to it as applied to BSI, meaning that the designations of BSI and BSPLC should stand or fall together.[27] The Court had ruled that some of the reasons given by the European Council for sanctioning BSI were inadmissibly vague and therefore some of the sanctions against BSI would be lifted.[28] I see no reason to dispute the characterization BSPLC gave about its ownership and relationship to BSI, which is consistent with how the BSI website lists BSPLC under the category entitled "branches and subsidiaries."[29]

42.     In October 2007, the U.S. Government found specifically that Iran used BSI and BSPLC to transfer many millions of dollars to Hezbollah in the years leading up to Hezbollah's

---

[25] *See Bank Saderat PLC v. Council of the European Union*, Case T-495/10 (EU March 20, 2013).

[26] http://www.saderat-plc.com/about_history.htm.

[27] As described in Maya Lester QC, "Another judgment on the listing of subsidiaries: a partial win for Bank Saderat PLC in the European Court, "http://sanctions145.rssing.com/browser.php?indx=11151758&item=3; http://curia.europa.eu/juris/document/document.jsf?text=&docid=135263&pageIndex=0&doclang=EN&mode=lst&dir=&occ=first&part=1&cid=291951

[28] http://curia.europa.eu/juris/document/document.jsf;jsessionid=9ea7d0f130d51d9830a92a1545408575aaff4043f007.e34KaxiLc3eQc40LaxqMbN4OchuOe0?text=&docid=133481&pageIndex=0&doclang=en&mode=lst&dir=&occ=first&part=1&cid=487255

[29] Both in Persian and in English; cf. https://www.bsi.ir/en/Pages/Branches/Branches.aspx

21

July 12, 2006 – August 14, 2006 rocket attacks on Israeli civilians. In an October 25, 2007 Press

Release, the U.S. Department of Treasury stated:

> … [] from 2001 to 2006, Bank Saderat transferred $50 million from the
> Central Bank of Iran through its subsidiary in London to its branch in Beirut
> for the benefit of Hizballah fronts in Lebanon that support acts of violence.[30]

43.     The U.S. Treasury Department reiterated this finding in a press release dated

November 6, 2008, stating: "Between 2001 and 2006, Bank Saderat transferred $50 million from

the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for

the benefit of Hizballah fronts that support acts of violence." [31]

44.     There is significant evidence that at least some of these transfers were routed

through the United States. A Treasury press release dated September 8, 2006 regarding the

decision to bar BSI (and its subsidiary BSPLC) from carrying out "U-Turn" transactions through

the U.S. banking system quotes Undersecretary Levey as follows: "Bank Saderat facilitates

Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations

each year. We will no longer allow a bank like Saderat to do business in the American financial

system, *even indirectly*," suggesting that until then BSI had been routing transfers through the

U.S., indirectly, through "U-Turn" transfers.[32] (emphasis added). In his prepared remarks that

same day, Undersecretary Levey also said: "Today, we have cut off one of the largest Iranian

---

[30] See 10/25/07 U.S. Department of Treasury Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, available at http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

[31] See 11/6/08 U.S. Department of Treasury Fact Sheet, available at: http://www.treasury.gov/press-center/press-releases/Pages/hp1258.aspx.

[32] Treasury Cuts Iran's Bank Saderat Off From U.S. Financial System, 09/08/06, available at https://www.treasury.gov/press-center/press-releases/Pages/hp87.aspx

state-owned banks, Bank Saderat, from the U.S. financial system. Here is why: This bank, which has approximately 3400 branch offices, is used by the Government of Iran to transfer money to terrorist organizations. Iran uses Saderat to transfer money to Hizballah."[33] The prohibition on U-Turn transactions also applied to BSPLC.[34]

45.     The conclusion that at least some portion of the $50 million in transfers to Hezbollah went through the U.S. is supported by other sources. For example, a deferred prosecution agreement between the U.S. and Lloyds TSB Bank, PLC states that "prior to 2002, Lloyds maintained USD correspondent accounts for what were then the London-based branches of Bank Sepah, Bank Melli, Bank Tejerat, Bank Mellat, **Bank Saderat**, and the Iranian Overseas Investment Bank. During this time, Lloyds was able to provide USD payment processing services through its relationships with other **correspondent banks in New York and elsewhere in the United States**."[35] (emphasis added). According to the deferred prosecution agreement, this payment processing of USD transactions continued until at least October 2004.[36] In addition, on January 10, 2007, the Wall Street Journal reported that: "Intelligence officials say Bank Saderat, a large, state-controlled Iranian bank placed on a U.S. Treasury blacklist in October for allegedly funding terrorism**, has been able to process dollar transactions through Commerzbank's New**

---

[33] *See* Prepared Remarks by Stuart Levey Under Secretary for Terrorism and Financial Intelligence, 09/08/06, available at https://www.treasury.gov/press-center/press-releases/Pages/hp86.aspx.

[34] https://www.treasury.gov/resource-center/sanctions/Programs/Documents/iran.txt

[35] *See* deferred prosecution agreement dated 09/01/09 at ¶ 13, available at http://www.gibsondunn.com/publications/Documents/LloydsTSB-DeferredProsecutionAgmt010909.pdf

[36] *Id*. at ¶ 21.

*York branch in recent months* by using the accounts of two other Iranian banks." [37] (emphasis added).

46.    BSI and BSPLC carried out these transfers for ideological reasons – *i.e.* to further Iran's goals of using Hezbollah terrorism to harm the United States and Israel – and not for commercial reasons. Any claim to the contrary is refuted by the fact that these transfers violated the U.S. sanctions programs on Hezbollah and were therefore very likely to result in serious financial and other consequences for BSI and BSPLC. In other words, these transfers were obviously and predictably against the economic and commercial interests of BSI and BSPLC. Indeed, as a direct result of these activities, on October 25, 2007, President Bush (along with the Treasury Department) exercised his powers pursuant to the IEEPA to subject BSI and BSPLC to sanctions under Executive Order 13224, which is specifically aimed at freezing the assets of terrorists and their supporters. This Executive Order prohibited all transactions between BSI/BSPLC and any "US person," as defined in the Order and froze any assets of BSI/BSPLC in the United States.[38]

47.    The language of Executive Order 13224 refers to "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States," which "constitute *an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States* . . ." (emphasis added). In addition, the IEEPA

---

[37] Simpson, Glenn R. and David Crawford, U.S. Effort to Isolate Iran Gains Ground as European Bank Restrictions Take Hold, *Wall Street Journal*, 1/10/07, available at http://www.wsj.com/articles/SB116836322857571555 (

[38] See 10/25/07 U.S. Department of Treasury Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, available at http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

authorizes the President to regulate commerce after declaring a national emergency in response to "***any unusual and extraordinary threat***, which has its source in whole or substantial part outside the United States, ***to the national security, foreign policy, or economy of the United States***."[39] (emphasis added). Thus, the fact that BSI and BSPLC were subjected to sanctions under Executive Order 13224 pursuant to the IEEPA means, by definition, that the U.S. government found their conduct to be a threat to the national security, foreign policy, or economy of the United States.

48.     The 2007 Treasury Department designation of BSI and its subsidiaries, including BSPLC, caused substantial financial losses to BSI, as described below. That effect was enhanced by the U.S.-led effort to warn about BSI activities in several ways discussed below, all of which would have engendered a reaction from any normal bank. The fact that BSI and BSPLC did not react is further proof that they do not act in their own commercial interests, but rather to further Iran's foreign policy interests – such as support of Hezbollah terrorism – even at the expense of their own economic well being.

49.     The U.S. warnings about dealing with Iranian banks were endorsed by many governments. In particular, the Financial Action Task Force (FATF)[40] issued statements regarding the risks posed by Iran and calling for countries to impose countermeasures. Its October 2007 statement included the passage, "FATF members are advising their financial

---

[39]  PL 95-223, § 202.

[40]  The Financial Action Task Force is an inter-governmental body whose 36 members include China, Russia, Japan, Korea, Australia, Canada, Mexico, the United States, and all the countries of the European Union, among others. Its purpose is to develop and promote policies to combat money laundering and terrorist financing around the world. Some though not all of its statements on Iran are available at http://www.fatf-gafi.org/publications/?hf=10&b=0&q=Iran&s=desc%28fatf_releasedate%29 (the other statements are available at other places on www.fatf-gafi.org).

institutions to take the risk arising from the deficiencies in Iran's AML/CFT [anti-money-laundering/ countering the financing of terrorism] regime into account for enhanced due diligence." This was upgraded in February 2009 into a warning:

> The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions. In addition to enhanced scrutiny, the FATF further calls on its members and urges all jurisdictions to apply effective counter-measures to protect their financial sectors from money laundering and financing of terrorism (ML/FT) risks emanating from Iran. Jurisdictions should also protect against correspondent relationships being used to bypass or evade counter-measures and risk mitigation practices, and take into account ML/FT risks when considering requests by Iranian financial institutions to open branches and subsidiaries in their jurisdiction.[41]

50.     The practical impact of this warning was that many international banks re-examined their correspondent relations and transactions with Iranian banks, including BSI and BSPLC, to the financial disadvantage of those entities, as described below.

51.     The U.S. government also pressed action specifically against BSI (and its subsidiaries) for its role in facilitating Iran's nuclear program. UN Security Council Resolution 1803, adopted March 3, 2008, in Operative Paragraph 10, "Calls upon all States to exercise vigilance over the activities of financial institutions in their territories with all banks domiciled in Iran, in particular with Bank Melli and Bank Saderat, and their branches and subsidiaries abroad, in order to avoid such activities contributing to the proliferation sensitive nuclear activities, or to the development of nuclear weapon delivery systems."[42] While this action was not for BSI's **support for terrorism, it demonstrates the fact that banks owned or controlled by Iran act to**

---

[41]        https://www.coe.int/t/dghl/monitoring/moneyval/About/FATF-2502.pdf.

[42] UN Security Council Resolution 1803, S/RES/1803(2008).

26

further Iran's policy goals even to their own financial detriment. The British and French government joined with the U.S. government in sending a letter to the Security Council in August 2008 warning against "Iran's continued attempts to conduct prohibited proliferation-related activity and terrorist financing."[43] At the urging of the U.S. government, on July 26, 2010, the EU froze the assets and placed strict limits on the activities of BSI and its subsidiaries due to it providing "financial services for entities procuring on behalf of Iran's nuclear and ballistic missile programmes."[44]

52.     All of these U.S. and U.S.-urged actions had a real financial impact on BSI and BSPLC. In response to the U.S. designation, BSI issued a statement complaining that the U.S. government was trying to create problems in its international activities particularly with European banks.[45] The *Financial Times* cited Judith Lee, a sanctions expert with the law firm Gibson, Dunn, & Crutcher, as saying that the Treasury designation "would make it very difficult for Bank Saderat to maintain a presence in the international banking system."[46] The *New York Times* described at length the impact of the U.S. actions on BSI and the other designated banks, referencing Middle East bankers who said those banks "were losing customers and struggling to

---

[43] http://www.reuters.com/article/us-iran-nuclear-banks-idUSN1531709020080815

[44] Council Decision 2010/413/CFSP, in the EU's official journal at http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv:OJ.L_.2010.195.01.0039.01.ENG

[45] Haig Simonian, US threatens further action against Iranian banks, 9/14/06, *Financial Times*, https://next.ft.com/content/5146baae-43fc-11db-8965-0000779e2340

[46] Guy Dinmore, US Treasury targets Iranian Bank, 9/6/06, *Financial Times*, http://www.ft.com/intl/cms/s/0/998cd048-3f9f-11db-a37c-0000779e2340.html?ft_site=falcon&desktop=true#axzz49n9LJWvZ

find new banking relationships" with more than 80 banks curtailing business with them.[47] The *New York Times* further quoted Iranian Finance Minister Davoud Danesh Jaffari complaining bitterly, "We had embarked on a serious and breathtaking game of chess with America's Treasury Department." Another Iranian bank hit by restrictions – Bank Mellat PLC – in 2013 sued in UK courts for 2.3 billion British pounds (about $4 billion) in damages for those restrictions (those 2009 restrictions had been under UK law rather than the 2010 restrictions on BSI which were under EU law and therefore not subject to a suit for damages). The scale of Bank Mellat PLC's claim suggests that the damages incurred by BSPLC from the restrictions it faced were considerable.

53.     In short, BSI and BSPLC had and have a strong financial incentive to either contest the Treasury designation or to change the behavior which led to that designation. Yet they did not do so, unlike their actions in Europe. BSI brought a suit in 2010 in the European Court of Justice against the Council of the European Union for the EU restrictions on BSI. BSI prevailed, with the Court finding that the Council had not provided BSI or the Court with the evidence on which the restrictions were based.[48]

54.     Had BSI and/or BSPLC contested their designations by the Treasury Department, there is every reason to think that their case would have been carefully considered. The U.S. government has a well-established track record of removing from its lists of designated entities those who were designated in error or who have changed their actions. The OFAC website fact

---

[47]     Robin     Wright,     Stuart     Levey's     War,     10/31/08,     *New     York     Times,* http://www.nytimes.com/2008/11/02/magazine/02IRAN-t.html?_r=0

[48] The Council also lost its appeal of the initial decision.  The appeal decision, which details the original                                        decision,                                        is                                        at http://curia.europa.eu/juris/celex.jsf?celex=62010TJ0494%2801%29&lang1=ga&type=TXT&ancre=

28

sheet about Executive Order 13224 gives many names of individuals and entities which have been removed from the designation list, especially after 2009.[49] As that list shows, the process of removal continues, e.g., Bank Al Taqwa Limited in the Bahamas was removed in February, 2015. The fact that BSI and BSPLC remain designated under that Executive Order (promulgated pursuant to the IEEPA) shows that they have not successfully contested the designation as a facilitator of terrorism and that the United States continues to view these banks as supporting terrorism and representing threats to United States interests. To explain why BSI and BSPLC have not contested the designation by the U.S. government as a facilitator of terrorism, I would apply the logical principle known as Occam's Razor (the simplest explanation is the best[50]): their silence betokens consent.

55.    The obvious reason why BSI and BSPLC have not changed their behavior so that they can become de-designated is that to do so would be against the policy of the government of Iran, for which the transfer of funds to Hezbollah in particular has been an important priority. In other words, BSI and BSPLC have continued a course of action which is against their financial interest because that is the course consonant with the foreign policy of the government of Iran. An example of how a state-owned entity which is a non-political, economic enterprise reacts to designations for prohibited activities involving Iran is the March 2016 actions of the Chinese telecommunications equipment maker ZTE. ZTE is 30.6% owned by ZTE Holdings, which is in turn 51% owned by state-owned enterprises. This relationship, under the laws of China and Hong Kong (where ZTE's shares are listed), is described as "state owned, privately managed." When

---

[49] https://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf

[50]  More formally, *Among competing hypotheses, the one with the fewest assumptions should be selected.*

on Mach 8, 2016, the U.S. Commerce Department imposed sanctions which could have restricted ZTE's activities on the U.S. market, ZTE responded within days by agreeing to far-reaching changes and close cooperation with a U.S. government investigation, as detailed in a March 23 *Financial Times* article ("ZTE to give details on Iran sales as US eases ban").[51]

56.     BSI and BSPLC are not the only Iranian government-owned banks which take actions that make no sense commercially but serve the foreign and security policy goals of the Iranian government. Indeed, the Iranian banking system has been subject to scandals and corruption for activities that advanced government interests, but commercially harmed the banks. Specifically, the Iranian government ordered banks to direct credit to particular borrowers, both to classes of borrowers and to individuals, as described in the annex on Relationship of Iran's Central Bank to the Iranian Government. The low government interest rates and the fact that some of the largest borrowers were not creditworthy resulted in heavy financial losses for the banks.  In its most recent report on the Iranian economy, the International Monetary Fund (IMF) highlighted the problems of the banks, resolution of which it called an "immediate priority for supporting growth."  The IMF wrote, "The complexity and severity of the challenges facing the banking system require immediate action….They [the authorities] also agreed that the elimination of government-mandated credit policies would help avoid a repeat of the many vulnerabilities present in the system."[52]

---

[51] *Financial Times*, March 23, 2016, "ZTE to give details on Iran sales as US eases ban."

[52] IMF, Islamic Republic of Iran -- Staff Report for the 2015 Article IV Consultation, http://www.imf.org/external/pubs/ft/scr/2015/cr15349.pdf,  p 17.

**F.     The Development of U.S. Sanctions Against Iran Further Establishes That the Banks Were Acting to Further Iranian Government Policies and That They Were Sanctioned for Their Own Conduct and not Simply for Their Connection to the Iranian Government**

57.     The fact that Iranian banks have operated against their own economic interest and in furtherance of Iranian policy can be seen from a review of the U.S. sanctions against Iran over the years.

58.     The U.S. government first placed sanctions on Iran in 1979 in response to Iran's seizure of the U.S. embassy in Tehran and the ensuing hostage crisis.  President Carter issued Executive Order 12170 in November 1979 freezing about $12 billion in Iranian assets. On January 20, 1981, the U.S. lifted all sanctions on Iran pursuant to the Algiers Accord – the agreement which led to the release of the U.S. hostages.[53]

59.     In the 1980s and 1990s, in reaction first to Iranian support for terrorism and later also out of concern about Iranian nuclear and missile activities, the U.S. government exercised its powers pursuant to the IEEPA and placed a variety of ever-tighter sanctions on Iran, targeting entities, including Iranian banks, due to their involvement in carrying out elements of Iranian foreign policy.

60.     Beginning in 1995, the Executive Orders specifically affected Iranian banks. In 1995, President Clinton issued Executive Orders 12959 and 13059. In *Weinstein v. Islamic Republic of Iran*, the court summarized these sanctions.[54] The *Weinstein* court explained that the 1995 Executive Orders subjected the banks to significant new restrictions on the basis that they

---

[53]     http://www.nytimes.com/1981/01/20/world/text-of-agreement-between-iran-and-the-us-to-resolve-the-hostage-situation.html?pagewanted=all

[54]     299 F. Supp.2d 63, 66-70 (E.D.N.Y. 2004)

were entities owned by the Iranian government, and Executive Order 13059 prohibited transactions with the Iranian government and any entity owned or controlled by it.[55] Thereafter, these banks could only continue to do business in the United States upon receiving a specific license from OFAC. The full relevant texts of the Executive Orders and regulations and a detailed – and unsympathetic – account of these sanctions is in the standard academic reference text on the subject, Hossein Alikhani, *Sanctioning Iran: Anatomy of a Failed Policy*, London: I.B. Tauris, 2000 (relevant pages attached hereto as Exhibit B).  It reprints the March 31, 1999 amendment to OFAC's Iranian Transactions Regulations implementing Executive Order 13059 in which various banks, including BSI, are listed by name. Also listed was "Bank Saderat Iran (Branch), Lothbury, London EC2R 7HD, England."

61.    Beginning in 2007, the United States government began designating Iranian banks on an individual basis for the specific actions taken by those banks. The first Iranian bank hit by a Treasury designation was Bank Sepah, designated January 9, 2007 pursuant to Executive Order 13382 about proliferation of weapons of mass destruction and their delivery mechanisms. The Treasury press release quoted Stuart Levey, Treasury's Under Secretary for Terrorism and Financial Intelligence: "Bank Sepah is the financial linchpin of Iran's missile procurement network and has actively assisted Iran's pursuit of missiles capable of carrying weapons of mass destruction."[56] More than 10 months later, on October 25, 2007, Treasury designated two additional banks, Bank Melli and Bank Mellat, under the same Executive Order. The Treasury Department press release about the designation explained, "Bank Melli provides banking

---

[55] *Id*. at 70.

[56] https://www.treasury.gov/press-center/press-releases/Pages/hp219.aspx.

services to entities involved in Iran's nuclear and ballistic missile programs, including entities listed by the U.N. for their involvement in those programs."[57]

62.    Also, on October 25, 2007, the Treasury Department designated BSI and BSPLC, but under Executive Order 13224 which specifically targets terrorists and their supporters due to the unusual and extraordinary threat they pose to the United States.[58] Indeed, although Treasury Department officials repeatedly stated that "Iran uses its state-owned banks … for financing terrorism," BSI (and its subsidiaries) has been the only Iranian bank designated under Executive Order 13224.   This suggests that Treasury is extremely careful and cautious about its designations.

63.    Treasury continued to investigate banks one by one.   Designations under Executive Order 13382 included among others: on October 22, 2008, the Export Development Bank of Iran; June 16, 2010, Post Bank of Iran; December 21, 2010, Mehr Bank and Ansar Bank; and May 17, 2011, Bank of Industry and Mines of Iran.[59]   Then, as noted above, on November 21, 2011, Treasury designated Iran as a "jurisdiction of primary money laundering concern under Section 311 of the USA PATRIOT Act" which affected all Iranian banks.

64.    This protracted process shows that Treasury was not painting with a broad brush, but instead considering the circumstances of each designated bank. It was only after four years and the designations of many individual banks that Treasury concluded that money laundering

---

[57] https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx

[58] *Id.*

[59] Kenneth Katzman, *Iran Sanctions*, Congressional Research Service Report 7-5700 of April 21, 2015, available at http://www.parstimes.com/history/crs_april21_15.pdf .   Since these banks have been delisted after the Iran nuclear deal, the OFAC website no longer lists which institutions were designated and when.

was so pervasive among Iranian banks that this money laundering could endanger the U.S. financial system. As the quotes above from Undersecretary Levey and Assistant Secretary Glaser state, Iran's banks engage in deceptive financial practices in order to support terrorism, among other reasons.

65.    These sanctions were directed at Iranian banks and not just at the Iranian government because the banks played an active role in carrying out Iranian policies which harmed the United States, as explained in the testimony by Treasury Department officials cited earlier.  In other words, the banks were not innocent bystanders who were caught up when the U.S. government decided to put pressure on the Iranian government. This is obvious from the way in which the sanctions against particular Iranian banks developed, on an individualized basis over a four-year period, as each sanctioned bank engaged in specific problematic activities.

66.    The slow development of the sanctions also illustrates that the banks that were sanctioned were aware their activities in furtherance of Iranian policy would likely harm them financially. Even if one were to suppose that the banks were not greatly concerned about the financial impact of U.S. sanctions because they were banned from transactions with U.S. nationals, they had every reason to be worried about EU action which would cut them off from the SWIFT (Society for Worldwide Interbank Financial Telecommunication) interbank transfer system. SWIFT is central to any bank's ability to transfer funds abroad in a timely and cost-effective manner.  The debate about Iranian access to SWIFT went on for years before the March 2012 suspension of EU-designated Iranian banks from the SWIFT system.[60] SWIFT continued to

---

[60] SWIFT, which is incorporated under Belgian law, took the position that the EU required it to suspend access to its system by banks designated by the EU. https://www.swift.com/insights/press-releases/swift-instructed-to-disconnect-sanctioned-iranian-banks-following-eu-council-decision

give access to other Iranian banks not designated by the EU.[61] Thus, while the designated banks had ample warning of what was coming, they persisted in their conduct of working with individuals, firms, and government agencies designated by the UN and/or EU for their role in Iranian nuclear and missile programs, even though those entities were relatively small players and so presumably not major profit centers for the banks concerned. From the fact that some Iranian banks retained access to SWIFT, it is clear that had the designated banks focused on their commercial interests instead of executing Iran's policies, they had good reason to think that they would retain access to SWIFT.

67.     Were these banks basing their decisions on commercial considerations, most of them would have exited the business lines to which the EU objected, leaving that business to a small number of banks which could possibly draw sufficient profit from those activities to justify the substantial cost of losing access to the SWIFT system.  For reference, in 2016-2017, the *Financial Times* reports that Deutsche Bank plans to cut its commercial client base from 65,000 to 30,000 largely because of regulatory and law enforcement concerns – a strategy referred to as "derisking" – and the *Wall Street Journal* wrote that in 2014 alone, J.P. Morgan Chase dropped over 100,000 customers over concern about money laundering.[62] A World Bank study found that

---

[61] Accounts differ on how many of the 30 banks with SWIFT access before 2012 remained connected to the system.  There is no dispute that at least five private and two smaller state-owned banks were connected as of mid-2015, as described by Iranian officials in http://financialtribune.com/articles/economy-business-and-markets/21026/7-banks-connected-swift

[62] http://www.ft.com/intl/cms/s/0/123550f6-16d7-11e6-9d98-00386a18e39d.html#axzz49JcJVvmq;  http://www.wsj.com/articles/account-closed-how-bank-de-risking-hurts-legitimate-customers-1439419093.

derisking has become a common practice.[63] While the rest of the international financial community is headed in the direction of derisking, Iranian state-controlled banks have adopted an entirely different approach, namely, they have continued to do business with highly risky customers to their financial detriment – because that is what Iranian government policy requires.

## G.     BSPLCs Transfer of $50 Million to Hezbollah Was Intended to Harm United States Interests

68.     There is no doubt that these transfers were intended to, and did, harm the interests of the United States. Indeed, as explained above, the decision of the U.S. government to subject an entity to financial sanctions pursuant to Executive Order 13224 and the IEEPA means that the U.S. considers the conduct that led to the sanctions to be harmful "to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701

69.     Here, the transfers increased Hezbollah's military capabilities to carry out terrorist operations around the world. As discussed above, Hezbollah has attacked the United States for decades, both directly and by attacking U.S. allies. The U.S. repeatedly and publicly stated that the Hezbollah rocket attacks on Israel during the summer of 2006 were harmful to the United States. For example, on or about July 19, 2006, then President George W. Bush stated the view of the U.S. that the Hezbollah rocket attacks were being directed at America's friend and ally and must be stopped - "[] it's now clear for all to see that there are terrorist elements who want to destroy our democratic friends and allies, and the world must work to prevent them from doing so."[64]

---

[63]     http://www.worldbank.org/en/topic/financialmarketintegrity/publication/world-bank-group-surveys-probe-derisking-practices

[64] http://www.democracynow.org/2006/7/19/headlines

70.     A few days later, Bush explained the U.S's policy in the region which Iran and Syria were trying to oppose through their terrorist proxy – Hezbollah: "For many years, Syria has been a primary sponsor of Hezbollah and it has helped provide Hezbollah with shipments of Iranian-made weapons…Iran's regime has also repeatedly defied the international community with its ambition for nuclear weapons and aid to terrorist groups. Their actions threaten the entire Middle East and stand in the way of resolving the current crisis and bringing lasting peace to this troubled region."[65] Bush reiterated these sentiments at an August 7, 2006 press conference during which he stated: "Now, I appreciate people focusing on Syria and Iran, and we should, because Syria and Iran sponsor and promote Hezbollah activities -- all aimed at creating chaos, all aimed at using terror to stop the advance of democracies."[66]

71.     Separately, then-White House Press Secretary Tony Snow echoed the U.S. position that: "Hezbollah, and also its supporting nations, Iran and Syria, need to understand that we are committed to peace and democracy in the region, and we're not going to back away from it."[67] Likewise, then-Secretary of State Condoleezza Rice explained the U.S. interest in creating a new Middle East, stating: "What we're seeing here, in a sense, is the growing -- the birth pangs of a new Middle East. And whatever we do, we have to be certain that we are pushing forward to the new Middle East, not going back to the old one."[68]

---

[65]     Bush Slams Syria, Iran over Hezbollah, 7/22/06, CNN, available at http://edition.cnn.com/2006/POLITICS/07/22/Bush.radio/

[66]     The President's News Conference with Secretary of State Condoleezza Rice in Crawford Texas, 08/07/06, available at http://www.presidency.ucsb.edu/ws/index.php?pid=540

[67]     Press Briefing by Tony Snow, 08/02/06, available at https://georgewbush-whitehouse.archives.gov/news/releases/2006/08/20060802-2.html

[68]     Secretary Rice Holds a News Conference, Washington Post, 07/21/06, available at http://www.washingtonpost.com/wp-dyn/content/article/2006/07/21/AR2006072100889.html

72.     Indeed, U.S. foreign policy with respect to the Hezbollah assault on Israel in the summer of 2006 was shaped by America's overall war on terrorism post 9/11, its desire to achieve a victory against, and send a strong message to, Iran, which through its proxy Hezbollah had historically used terrorism to target the U.S. (as discussed above) and the desire of the U.S. to see the spread of democracy in the Middle East, as reflected by the statements quoted in the preceding paragraphs.[69]

73.     Aside from the impact these transfers had on Hezbollah in Lebanon with regard to its terrorist operations against Israel, these transfers also were part of the financial flows which were a key component in Hezbollah's ability and willingness to ramp up its role in attacks on U.S. soldiers in Iraq. Damning evidence about Hezbollah's killing U.S. soldiers in Iraq in 2006-2007 came to light with the March 2007 U.S. capture in Iraq of senior Hezbollah commander Ali Musa Daqduq. The *New York Times* described the episode as follows:

> "Iranian operatives helped plan a January [2007] raid in Karbala in which five American soldiers were killed, an American military spokesman in Iraq said today. Brig. Gen. Kevin J. Bergner, the military spokesman, also said that Iran's Islamic Revolutionary Guard Corps has used operatives from the Lebanese militia group Hezbollah as a 'proxy' to train and arm Shiite militants in Iraq....More generally, General Bergner added, Iran's Quds Force has been using Lebanese Hezbollah as a 'proxy' or 'surrogate' in training and equipping Shiite militants in Iraq....
>
> "Information was obtained following the capture of a senior Hezbollah operative, Ali Musa Daqduq, General Bergner said. The capture of Mr. Daqduq had remained secret until today....According to General Bergner, Ali Musa Daqduq joined Hezbollah in 1983, commanded Hezbollah units in Lebanon and was involved in coordinating the protection of the group's leader, Secretary General Hassan Nasrallah. Hezbollah has been armed and funded by Iran. In 2005, the Hezbollah leadership instructed Mr. Daqduq to go to Iran

---

[69] Pressman, Jeremy, The United States and the Israel-Hezbollah War, Crown Center for Middle East Studies, Brandeis University, No. 13, Nov. 2006, available at http://www.brandeis.edu/crown/publications/meb/MEB13.pdf

and help the Quds Force train Shiite Iraqi militants, General Bergner said. Mr. Daqduq went to Tehran in 2006 with Yussef Hashim, another Hezbollah operative who serves as the head of the group's operations in Iraq. They met with the senior Quds force commanders and were directed to go to Iraq and report on efforts to train Shiite militants there, General Bergner said. Groups of up to 60 Iraqi militants were brought to Iran for military instruction at three camps near Tehran and trained in using road-side bombs, mortars, rockets, kidnapping operations and in how to operate as a sniper. The Quds Force also provided up to $3 million in funding a month to the Iraqi militants, the American general said."[70]

74.     The $50 millions which BSI and BSPLC transferred to Hezbollah, in furtherance of Iran's policies, gave Hezbollah resources and reason to agree to be Iran's proxy in attacking U.S. soldiers in Iraq, as detailed by General Bergner.


**H.     Conclusion**

75.     Hezbollah, a Shia Lebanese Islamist organization established in 1982 under Iranian auspices, is a central regional client of Iran. Iran maintains the organization financially and through training and the provision of arms. Many U.S. Courts have so found.

76.     From 2001 to 2006, Iran transferred $50 million to Hezbollah with the active participation of its state owned and controlled bank, BSI, and BSI's subsidiary, BSPLC. Consistent with the allegations in the Complaint, when they transferred the $50 million to Hezbollah, BSI and BSPLC were acting pursuant to Iran's foreign policy to support terrorism

---

[70] See Michael Gordon, "U.S. Ties Iran to Deadly Iraq Attack," July 2, 2007, http://www.nytimes.com/2007/07/02/world/middleeast/02cnd-iran.html?_r=00

and harm the United States. As explained, during the relevant period, BSI was owned by and subject to tight control of the Iranian government, which ensured that BSI (and its subsidiaries including BSPLC) acted in furtherance of Iranian government policy. BSI and BSPLC made a commercially risky, and ultimately harmful, decision because they were fulfilling Iranian government policy. The U.S. government clearly viewed this activity as harmful to its interests, and on that basis, designated BSI and BSPLC and subjected them to financial sanctions pursuant to the IEEPA, which by definition applies to activity harmful to U.S. interests.

77.     Moreover, by increasing Hezbollah's military capabilities, the funds contributed to Hezbollah's ability to target the U.S. and its allies and actually harmed the United States. Thus, Hezbollah was able to launch a three week rocket assault on Israeli civilians in the summer of 2006, an action which implicated U.S. foreign policy in the Middle East, and Hezbollah was able to directly target U.S. soldiers in Iraq.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS
OF THE UNITED STATES OF AMERICA THAT THE FOREGOING
IS TRUE AND CORRECT.

-----------------------------------------

Patrick Clawson, PhD.

May 31, 2016
Date

40

Annex to Patrick Clawson's Declaration

# Relationship of Iran's Central Bank to the Iranian Government
### by Patrick Clawson

The relationship between Iran's Central Bank, whose name in the Persian language is Bank Markazi Iran (CBI), and the Iranian government can be examined from the point of view of the legal framework, from actual practice, and from the perspective of economists. In law, CBI is owned by and is tightly linked to the Iranian government. In practice, the Iranian government exercises tight control over the CBI, ignoring the law by issuing direct orders to the CBI.  From the perspective of economists, the CBI has less independence from the government than do central banks in most developed countries.

**The Legal Framework**
The legal foundation of CBI remains the 1972 Monetary and Banking Law (MBL) – also referred to as the Monetary and Banking Act – despite the intervening 1979 revolution. The MBL can be found on the official website of the CBI, both in the Persian and English languages; the location is http://www.cbi.ir/simplelist/1457.aspx. The English translation is excellent; it accurately represents the Persian original. The post-revolutionary laws about banking – the Nationalization of Banks Law, the Law on Unsury (Interest) Free Banking Operations, and the Administration Law of Banks – have little if any implication for that legal foundation. Since the adoption of the Law on Unsury (Interest) Free Banking Operations, the MBL provisions about the CBI regulating interest rates has been modified to the extent that different terminology is used to conform with the theory that banking is done without interest, but the practical difference is small. Those laws can also be found in the Persian and English languages on the CBI website.

The MBL provides that CBI is a joint-stock company exempt, unless otherwise stipulated, from the general laws and regulations applying to ministries and other government entities. The capital is set at five billion rials, now approximately equal to $500,000 but in 1972 equal to approximately $70 million. That capital is "wholly owned by the Government," to quote MBL Article 10 (e).

The MBL provides that the forum of the shareholders is the General Meeting. Membership in that seems to have changed a bit over the years as ministries were divided or consolidated, but both law and

1

practice has been that the only attendees are the CBI Governor and members of the cabinet, that is, government ministers. The MBL specifies that the General Meetings shall consist of the CBI Governor, the Minister of Finance and Economic Affairs, and one other minister appointed by the Council of Ministers. Members of other organs of the Bank may attend meetings of the General Meeting but do not have a vote. The General Meeting approves the balance sheet and the amount of net profit. MBL Article 25 (b) provides that all CBI profit after provisions for a contingency reserve "shall go to the Government."

As provided in the MBL, there is a Supervisory Board, elected upon recommendation of the Minister of Finance and Economic Affairs by the General Meetings, which consists of five auditors or other persons versed in accountancy or banking; they are responsible for auditing the accounts.

The MBL provides that the Governor of the CBI is appointed for a five-year term by "Royal Decree," upon recommendation of the Minister of Finance and Economic Affairs subject to approval by the cabinet (now composed of the President of Iran and the ministers). The Deputy Governor is also appointed for a five-year term by "Royal Decree," upon the recommendation of the Governor, the agreement of the Minister of Finance and Economic Affairs, and the approval of the cabinet. The Governor is the CBI's highest executive and administrative authority and is liable for the proper conduct of the affairs of the CBI and implementation of the MBL. He appoints a Secretary General and three Vice Governors, subject to approval by the General Meeting; those five plus the Governor make up the Executive Board.

Under the MBL, an important role is to be played by the Currency and Credit Council (CCC), which is composed of the CBI Governor, various government officials such as the Prosecutor General and one of the undersecretaries of the Economics and Finance Minister, businessmen (the president of the Chamber of Commerce and the managing director of the Banking Association), and experts appointed by economics ministers. Under the MBL, the CCC "shall: 1. Examine and approve the organization, budget, employment code, and internal regulations of the CBI; ... 3. Review and approve the regulations drawn up under the provisions of this Act; 4. Comment upon the banking, monetary and credit issues of the country," among other things.

**CBI in Practice**

In practice, the MBL has been stretched in several ways, presumably governed by regulations, though I have not in all cases found the relevant regulations. The General Meetings appear to be often attended by other economic ministers, especially the Minister of Commerce, the Housing Minister, the Agriculture Minister, the Industry Minister, the

2

Cooperatives Minister, the Housing and Construction Minister, the Mines Minister, and until its abolition the Head of the Plan and Budget Organization. The composition of the CCC appears in practice to vary from that specified by the MBL, for instance, by the inclusion of two non-voting legislative deputies chosen by the Majlis (Parliament). Though not mentioned in the MBL, there is in practice a "High Banking Council" made up of the CBI Governor, the CBI General Secretary, the managing director of Bank Melli (the largest bank, completely state owned), and representatives of various ministers – typically the same ministers who are at the General Meeting.

More importantly, the CBI in practice is much more directly controlled by the government than it is in theory. That was particularly true under the 2005-13 government headed by President Mahmoud Ahmadinejad, but it continues to be true under the current government headed by President Hassan Rouhani.

First, the CBI governor in practice serves at the pleasure of the President. One could argue that in the absence of the monarch referenced in the MBL, the President in his capacity as head of state appoints the Governor. However, the MBL still specifies a specific five-year term of office for the Governor, with no mention made about procedures by which the Governor may be dismissed before the end of his term of office. That provision has been ignored. In August 2007, Ebrahim Sheybani resigned as CBI Governor under strong pressure from Ahmadinejad – an action which seems consistent with the letter of the MBL if not with its spirit. But in 2008, his successor Tahmasb Mazaheri refused to resign. His last letter to Ahmadinejad was leaked to the press; excerpts are available in English at http:\\www.roozonline.com/english/news/newsitem/article/2008/septembe r/29//central-bank-governors-goodbye-letter-revealed.html. In it, Mazaheri complained his recommendations "are not and will not be accepted," his suggestion about reforms "was not attended to," and "necessary measures were not taken" about problems he identified. He added that he knew "sending a report to the leader means the end of my cooperation at the central bank." And indeed, upon receiving the letter, Ahmadinejad signed a decree naming a new CBI Governor. None of this was consistent with the spirit or the letter of the MBL, which sets out a fixed five-year term for the CBI Governor.

Second, the government cabinet regularly votes at its meeting to order the CBI to extend loans for specific purposes. For instance, to take two examples at random, on March 15, 2007, the 26th cabinet session of the first Ahmadinejad government ordered the CBI to lend 50 billion rials for marriage, medical treatment, education and housing loans, while on April 20, 2007, the 27th cabinet session ordered the CBI to extend 150 billion rials for the same purposes. The MBL provides that the CBI "shall

3

be vested with the following powers: (1) Granting of loans and credits to ministries and government organizations, subject to legal authorization..." That is quite a different procedure from the government ordering the CBI to extend loans for specific purposes.

Third, the CCC plays little of the role laid out for it in the MBL. Major decisions about monetary policy are made directly by the government. During the Ahmadinejad era, these decisions were often made personally by the President without consulting the CCC. For instance, in his speech of April 16, 2008, Ahmadinejad describes orders he had given the CBI about monetary policy. On July 14, 2009, the semi-official Mehr News Agency announced that the CCC had met for the first time in two years. Indeed, in August 2007, Ahmadinejad announced he had dissolved the CCC; press reports stated that this action was what precipitated Sheybani' resignation as CBI Governor. This seems inconsistent with the MBL's provision that the CCC approves monetary regulations and the CBI budget.

A telling illustration of the CBI's subservience to the government has been the issue of setting interest rates – that term being widely used in discussion of the issue in Iran, even though an elaborate ruse is used to present the interest rates as consistent with a strict interpretation of Islamic law which bans interest. While running for the presidency and since assuming office, Ahmadinejad insisted that interest rates be kept low, which he thought would reduce inflation – a viewpoint for which he has been harshly criticized by Iranian economists. His insistence on this point is what led him to force the resignation of one CBI Governor and to dismiss another, as well as to order that the CCC be dissolved. The interest rate on loans has been well below the inflation rate, with the result that demand for loans is extremely high. In practice, loans nearly always go to those with good political connections. The low interest rates have also led to an explosion of non-bank financial institutions, vaguely similar to U.S. credit unions, many of which are run by politically well-connected institutions such as the Islamic Republican Guard Corps. It would be fair to say that the chief beneficiaries of the low-interest-rate policy have been the political elite; to be less polite, the policies Ahmadinejad imposed on the banking system facilitate corruption.

Under Rouhani, the government's focus has been on reducing the inflation rate.  This has led to a restrictive monetary policy, an artificially fixed exchange rate to keep import prices low, and a contractionary fiscal stance (at first, running a budget surplus and then, when the collapsing oil price slashed government revenue, sharply curtailing government spending).  The CBI has been the principal implementer of the first two of these policies, which have pushed Iran into a recession.  The Rouhani stance has been highly controversial, to the point that four important Cabinet Ministers sent him a letter criticizing his economic policy (the

4

letter was subsequently leaked to the press). In the debates about the policy, it has been extremely clear that the CBI policies were being implemented at Rouhani's direction, rather than as a result of decisions by the CCC or the CBI General Meeting.

**The Economic Concept of Central Bank Independence from the Government**

Many central banks have a complicated governing structure with a large government role. In other cases, the central bank is essentially a government department, with its management under about the same degree of government control as that of a ministry like the Ministry of Finance. Economists have long been intensely interested in to what extent central banks are independent from the government. Several influential articles presented somewhat different ways to measure central bank independence:

Alesina, A. and L.H. Summers, Central Bank Independence and Macroeconomic Performance: Some Comparative Evidence, *Journal of Money, Credit and Banking*, 25(2), May 1993, pp. 151-62.

Grilli, V., D Masciandaro, G. Tabellini, "Political and Monetary Institutions and Public Financial Policies in the Industrial Countries," *Economic Policy*, Vol. 13, October 1991, pp. 341-92.

Cukierman, A., P. Kalaitzidakis, L.H. Summers and S.B. Web, "Central Bank Independence, Growth, Investment and Real Rates," in Meltzer A.H. and I.P. Charles (eds.), *Carnegie-Rochester Conference Series on Public Policy*, No. 39, December 1993, pp.95-140.

Eijffinger, S.C.W. and E. Schaling, "Central Bank Independence in Twelve Industrial Countries," *Banca Nazionale del Lavoro Quarterly Review*, No. 184, March 1993, pp. 49-70.

These articles are concerned with such factors as whether the central bank governor has a fixed term, whether the governor can be dismissed, and other legal provisions which strengthen the central bank's position in conflicts with the government. But the articles are also concerned with the bank's independence in economic policy formulation, such as setting interest rates and lending to the government, and in banking supervision.

Each of these indices to Iran has been applied to Iran in a 551-page 2000 Ph.D. dissertation at the Catholic University of Brabant (the Netherlands) by Abloghassem Jamshidi, *The Financial System and Monetary Policy in the Islamic Republic of Iran*; the thesis, written in the English language, was published by Tilburg University in 2000. Each of those indices used slightly different criteria, and they each had very different scoring systems (as an analogy: a baseball game has very different scores from a basketball game). He scores the CBI's independence using the criteria developed in each of those four articles

5

and then compares that score to those of eighteen developed countries analyzed by the authors of those four articles (Australia, Austria, Belgium, Canada, Denmark, France, Germany, Greece, Ireland, Italy, Japan, Netherlands, New Zealand, Portugal, Spain, Switzerland, U.K. and the U.S.). He presented the minimum independence score for those eighteen, the maximum independence score, and the average independence score. The results were:

| | Iran's Score | Score of the 18 developed countries | | |
| --- | --- | --- | --- | --- |
| | | Minimum | Average | Maximum |
| Alesina | 1 | 1 | 2.15 | 4 |
| Grill, Masciandaro, and Tabellini | 6 | 3 | 7.61 | 13 |
| Cukierman | .43 | .14 | .37 | .68 |
| Eijffinger and Schaling | 2 | 1 | 3.21 | 5 |

Using three of the four systems, CBI is less independent from the government than the average for the eighteen developed countries. The primary factors on which the CBI scored higher for independence were on economic policy formulation and in banking supervision. With regards to provisions which allow the central bank to act independently of the government, CBI is distinctly less independent than are most developed country central banks.

Within Iran, many complaints have been heard that the CBI lacks independence from the government. In a 2006 interview about the government's Fourth Development Plan (a document setting out government economic goals and policies for the next five years), former deputy minister of economic affairs and finance Mohsen Safa'i-Farahani praised the Plan because, "The Central Bank will be taken out of government control. In other words, this will put an end to the interference of the government's economic sectors, such as the Ministry of Finance and Economic Affairs, in the Central Bank" (the reforms envisaged in 2006 were not carried out). On June 10, 2006, CBI Governor Sheybani "once again called for more independence for the Central Bank," according to the newspaper *Siyasat-e Ruz*, arguing, "An independent central bank can wisely outline and execute monetary policies; otherwise it must be a mere follower of the government." After Sheybani resigned as Governor in August 2007, Iranian press reports stated that the CBI's loss of independence from the government, as evidenced by the dispute over interest rates, was the main factor in his resignation.

**Conclusion**

6

There is no doubt that Iran's laws state that the CBI is owned by the
Iranian government and give the Iranian government great influence over
the CBI. In practice, the Iranian government treats the CBI much the same
way as it treats any government ministry, that is, with very little if any
independence. On balance, the CBI is less independent from the
government than do the central banks of most developed countries.

**Exhibit A**
**Curriculum Vita of Patrick L. Clawson**


Dr. Clawson is Director for Research at The Washington Institute for Near East Policy. His previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.

Dr. Clawson speaks often about Iran for U.S. government audiences, including for the Office of the Director of National Intelligence, the United States Central Command, the U.S. Army's Central Command, various offices at the State Department (including briefing U.S. ambassadors to Middle Eastern countries), and tours arranged by several U.S. embassies.  He has lectured about Iran and Middle East politics in more than twenty countries, including Saudi Arabia, the U.A.E., Kuwait, Bahrain, Israel, Russia, China, Britain, France, Germany, Italy, Spain, the Netherlands, Belgium, Austria, Poland, Portugal, the Czech Republic, Australia, and Canada.

Dr. Clawson has testified often about Iran before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees. From 2009 through 2014, he served on the Distinguished Advisory Panel of the Department of Energy's Sandia National Laboratory, which is the lead actor on many nuclear security issues. From 1994 to 2012, Dr. Clawson was senior editor of *Middle East Quarterly*. From 1990 through 1994, he was editor of *Orbis*, a foreign policy quarterly.

 Dr. Clawson has written extensively about Iran including for *The New Republic* as well as op-ed articles in *New York Times*, *Wall Street Journal*, and *Washington Post*, among other newspapers. He is the author of more than thirty scholarly articles in *Foreign Affairs*, *Survival*, *Washington Quarterly*, *International Journal of Middle East Studies*, *Middle East Journal*, *Les Cahiers de l'Orient*, and *Oxford Bulletin of Economics and Statistics*, among other journals.

Dr. Clawson most recent co-authored book, *The Monetary History of Iran From the Safavids to the Qajars* (I.B. Tauris, 2013), with Rudi Matthee and Willem Floor, won the Middle East Studies Association of North America's Pourshariati Award for best book about Iran. His 14 other books and monographs about Iran include: *Preventing an Iranian Nuclear Breakout: U.S.-Israel Coordination* (The Washington Institute for Near East Policy, 2012, with David Makovsky);  *An Iranian Nuclear Breakout Is Not Inevitable* (The Washington Institute for Near East Policy, 2011); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventive Military Action Against Iran* (The Washington Institute for Near East Policy, 2008, with Michael Eisenstadt); and *Deterring the Ayatollahs: Complications in Applying Cold War Strategy to Iran* (The Washington Institute for Near East Policy, 2007, edited with Michael Eisenstadt); and *Eternal Iran: Continuity and Chaos* (Palgrave, 2005, with Michael Rubin).  He has also written or edited seven monographs and books on other issues about the Middle East, such as energy security.

Dr. Clawson has been an expert witness about Iran in thirty federal court cases, mostly about Iran's support for terrorism.  Those case include: including *Cicippio v. Islamic Republic of Iran*, 18 F. Supp.2d 62, 68 (D. D.C. 1998); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stehem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);  *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at * 3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan*, et al., No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), among others.

Dr. Clawson's Ph.D. in economics is from the New School for Social Research and his B.A. is from Oberlin College. He speaks fluently Persian and French , as well as some Hebrew, Spanish, and German.

# EXHIBIT B

# SANCTIONING IRAN

## Anatomy of a Failed Policy

Hossein Alikhani

I.B. Tauris Publishers

*To Jila, for being there and keeping me sane*

# CONTENTS

Preface and Acknowledgements — ix

1 THE SEEDS OF DISTRUST: THE HISTORICAL BACKGROUND — 1

2 SANCTIONS: AN INTEGRAL PART OF US FOREIGN POLICY — 23
  Definition — 23
  The History of Sanctions, Pre-1945 — 25
  The History of Sanctions, Post-1945 — 27
  The US Rationale for Sanctions — 30
  Sources of Authority for US Unilateral Economic Sanctions — 32
  The Trading With the Enemy Act — 33
  The Export Administration Act — 37
  – The EAA in the 1990s — 48
  The International Emergency Economic Powers Act — 53
  Limitations of Presidential Power — 54
  – The Power to Vest Foreign Property — 54
  – The Power to Regulate Purely Domestic Transactions — 55

DOCUMENT 1: THE TYPOLOGY OF NON-VIOLENT SANCTIONS — 57

DOCUMENT 2: THE INTERNATIONAL EMERGENCY ECONOMIC
POWERS ACT — 59

3 SANCTIONS: A RATIONAL RESPONSE TO THE HOSTAGE-TAKING — 66
  The United States' Allies and Sanctions — 71
  The Approach to the United Nations — 72
  New Unilateral Measures — 77
  – The Sanctions in Detail: Blocking the Assets — 77
  – The Sanctions in Detail: Trade Embargo — 83

4 RESOLUTION OF THE HOSTAGE CRISIS — 86
  The Hostage Settlement Agreement — 90
  – The General Declaration — 93
  – The Settlement Declaration — 93
  – Supplementary Agreements — 94
  The End of the Crisis — 94
  Implementation of the Hostage Agreements — 95
  Regulations for Implementing the Hostage Agreements — 96
  US Courts and the Hostage Agreements — 101
  – Dames & Moore v Regan — 103

DOCUMENT 3: THE ALGIERS DECLARATION — 106
  — 108

Published in 2000 by I.B.Tauris & Co Ltd
Victoria House, Bloomsbury Square, London WC1B 4DZ
175 Fifth Avenue, New York NY 10010
Website: http://www.ibtauris.com

In the United States and Canada distributed by St Martin's Press
175 Fifth Avenue, New York NY 10010

Copyright © Hossein Alikhani, 2000

All rights reserved. Except for brief quotations in a review, this book, or
any part thereof, may not be reproduced, stored in or introduced into a
retrieval system, or transmitted, in any form or by any means, electronic,
mechanical, photocopying, recording or otherwise, without the prior
written permission of the publisher.

ISBN 1 86064 626 3

A full CIP record for this book is available from the British Library
A full CIP record for this book is available from the Library of Congress

Library of Congress catalog card: available

Typeset in Stone by Dexter Haven, London
Printed and bound in Great Britain

| | | |
|---|---|---|
| 5 | DOCUMENT 4: DAMES & MOORE V REGAN | 131 |
| | SANCTIONS: THE NEXT STAGE | 154 |
| | Iranian Transactions Regulations | 158 |
| | Foreign Policy Export Controls | 160 |
| | Dual Containment: A New Policy | 166 |
| | DOCUMENT 5: THE IRAN-IRAQ NON-PROLIFERATION ACT OF 1992 | 171 |
| 6 | NEW SANCTIONS: THE EFFECT OF LOBBYING | 177 |
| | D'Amato Demands More Sanctions | 186 |
| | New Sanctions | 192 |
| | Iranian Transactions Regulations | 195 |
| | – General Definitions | 196 |
| | – The Importation of Goods and Services from Iran | 197 |
| | – The Exportation of Goods and Services to Iran | 198 |
| | – Re-export to Iran | 199 |
| | – Banking Services | 200 |
| | – Other Prohibited Transactions | 201 |
| | A Customized Executive Order | 203 |
| | The United States Eases Sanctions | 207 |
| | Counternarcotics | 207 |
| | US Food and Medicine | 207 |
| | DOCUMENT 6: THE IRANIAN TRANSACTIONS REGULATIONS | 210 |
| | DOCUMENT 7: EXECUTIVE ORDER 13059 OF 19 AUGUST 1997 PROHIBITING CERTAIN TRANSACTIONS WITH RESPECT TO IRAN | 246 |
| | DOCUMENT 8: AMENDMENT TO THE IRANIAN TRANSACTIONS REGULATIONS (31 MARCH 1999) | 251 |
| | DOCUMENT 9: AMENDMENT TO THE IRANIAN TRANSACTIONS REGULATIONS (26 JULY 1999) | 275 |
| | DOCUMENT 10: AMENDMENT TO THE IRANIAN TRANSACTIONS REGULATIONS (27 OCTOBER 1999) | 284 |
| 7 | THE SANCTIONS TIGHTEN FURTHER | 288 |
| | The Iran Foreign Oil Sanctions Act of 1995 | 289 |
| | The New Iran Oil Sanctions Act of 1995 | 297 |
| | The Iran Oil Sanctions Act of 1996 (House of Representatives Version) | 299 |
| | Reaction to the Bill in the United States | 301 |
| | The Final House Version of the Bill | 307 |
| 8 | A BILL TO HAUNT A PRESIDENT | 309 |
| | Iran in the ILSA | 314 |
| | Europe Stands Firm | 320 |
| | The European Union Blocks the ILSA | 326 |
| | Total Ignores the ILSA | 328 |
| | The United States Yields to European Pressure | 330 |
| | Congress Strikes Back | 331 |
| | Russian Companies Targeted by Sanctions | 334 |
| | Iran, A Religious Rights Offender | 334 |
| | New Sanctions Welcome Changes in Iran | 335 |
| | DOCUMENT 11: THE IRAN AND LIBYA SANCTIONS ACT OF 1996 | 336 |
| | DOCUMENT 12: EUROPEAN UNION COUNCIL BLOCKING REGULATION | 350 |
| | EXTRATERRITORIALITY AND THE IRAN AND LIBYA SANCTIONS ACT | 360 |
| 9 | Jurisdiction | 361 |
| | – Bases of Jurisdiction | 363 |
| | – The Territorial Principle | 363 |
| | – The Protective Principle | 365 |
| | – The Nationality Principle | 365 |
| | – The Passive Personality Principle | 366 |
| | – The Universal Principle | 366 |
| | – The Extension of the Bases of Extraterritorial Jurisdiction | 367 |
| | The Enforcement of Extraterritoriality in the Economic Sphere | 368 |
| | US Extraterritoriality under the EAA | 371 |
| | – Re-export Control | 372 |
| | – The Control of Foreign Products | 373 |
| | – Export by a US Person | 374 |
| | – The Pipeline Controversy | 375 |
| | – The Jurisdictional Reach of Export Controls | 375 |
| | US Extraterritoriality Under the IEEPA | 379 |
| | The Cuban Democracy Act | 381 |
| | The Cuban Liberty and Democratic Solidarity Act of 1996 | 384 |
| | The Legitimacy of the ILSA | 386 |
| | – The Territorial Principle | 388 |
| | – The Protective Principle | 389 |
| | – The Nationality Principle | 390 |
| | – The Universal Principle | 390 |
| | – The Reasonableness Principle | 390 |
| | Economic Coercion and UN Resolutions | 391 |
| | The United Nations Rejects Extraterritorial Sanctions | 393 |
| | Conclusion | 394 |

# DOCUMENT 7

## Executive Order 13059

### of 19 August 1997

### Prohibiting Certain Transactions with Respect to Iran

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) ('IEEPA'), the National Emergencies Act (50 U.S.C. 1601 et seq.), section 505 of the International Security and Development Cooperation Act of 1985 (22 U.S.C. 2349aa-9) ('ISDCA'), and section 301 of title 3, United States Code, I WILLIAM J. CLINTON, President of the United States of America, in order to clarify the steps taken in Executive Orders 12957 of March 15, 1995, and 12959 of May 6, 1995 to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States declared in Executive Order 12957 in response to the actions and policies of the Government of Iran, hereby order:

**Section 1.** Except to the extent provided in section 3 of this order or in regulations, orders, directives or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran, other than the information or informational materials within the meaning of section 203(b)(3) of IEEPA (50 U.S.C. 1702(b)(3)), is hereby prohibited.

**Section 2.** Except to the extent provided in section 3 of this order, in section 203(b) of IEEPA (50 U.S.C. 1702 (b)), or in regulations, orders, directives, or licenses issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, the following are prohibited:

(a) The exportation, reexportation, sale, or supply, directly or indirectly from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason, to know that:

(i) such goods, technology, or services are intended specifically for supply, transhipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(ii) such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transhipped, or reexported exclusively or predominantly to Iran or the Government of Iran;

(b) the reexportation from a third country, directly or indirectly, by a person other than a United States person of any goods, technology, or services that have been exported from the United States, if:

(i) undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran, and

(ii) the exportation of such goods, technology, or services to Iran from the United States was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of the actions taken pursuant to national emergency declared in Executive Order 12957; provided, however, that this prohibition shall not apply to those goods or that technology subject to export license application requirements if such goods or technology have been:

(c) substantially transformed into a foreign-made product outside the United States; or

(d) incorporated into a foreign-made product outside the United States if the aggregate value of such controlled United States goods and technology constitutes less than 10 percent of the total value of the foreign-made product to be exported from a third country

(c) any new investment by a United States person in Iran or in property, including entities, owned or controlled by the Government of Iran;

(d) any transaction or dealing by the United States person, wherever located, including purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing, in or related to:

(i) goods or services of Iranian origin or owned or controlled by the Government of Iran; or

(ii) goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran;

(e) any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this order if performed by a United States person or within the United States; and

(f) any transaction by a United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order.

**Section 3.** Specific licenses issued pursuant to Executive Orders 12613 (of October 29, 1987), 12957, or 12959 continue in effect to the extent revoked, amended, or modified by the Secretary of the Treasury. General licenses, regulations, orders, and directives issued pursuant to those orders continue in effect in accordance with their terms except to the extent inconsistent with this order or to the extent revoked, amended, or modified by the Secretary of the Treasury.

**Section 4.** For the purpose of this order:

(a) the term 'person' means an individual or entity;

(b) the term 'entity' means a partnership, association, trust, joint venture, corporation, or other organization;

(c) the term 'United States person' means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States;

(d) the term 'Iran' means territory of Iran and any other territory or marine area, including the exclusive economic zone and continental shelf, over which the Government of Iran claims sovereignty, sovereign rights, or jurisdiction, provided that the Government of Iran exercises partial or total de facto control over the area or derives a benefit from economic activity in the area pursuant to international arrangements;

(e) the term 'Government of Iran' includes the Government of Iran, any political subdivision, agency, or instrumentality thereof, and any person owned or controlled by, or acting for or on behalf of, the Government of Iran:

(f) the term 'new investment' means:

(i) a commitment or contribution of funds or other assets; or

(ii) a loan or other extension of credit, made after the effective date of Executive Order 12957 as to transactions prohibited by that order, or otherwise made after the effective date of Executive Order 12959.

**Section 5.** The Secretary of the Treasury, in consultation with the Secretary of State and, as appropriate, other agencies, is hereby authorized to take such actions, including the promulgation of rules and regulations, the requirement of reports, including reports by United States persons on oil and related transactions engaged in by their foreign affiliates with Iran or the Government of Iran, and to employ all powers granted to me by IEEPA and the ISDCA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

**Section 6.**

(a) The Secretary of the Treasury may authorize the exportation or reexportation to Iran or the Government of Iran of any goods, technology, or services also subject to export license application requirements of another agency of the United States Government only if authorization by that agency of the exportation or reexportation to Iran would be permitted by law.

(b) Nothing contained in this order shall be construed to supersede the requirements established under any other provision of law or to relieve a person from any requirement to obtain a license or other authorization from another department or agency of the United States Government in compliance with applicable laws and regulations subject to the jurisdiction of that department or agency.

**Section 7.** The provisions of this order consolidate the provisions of Executive Orders 12613, 12957, and 12959. Executive Order 12613 and subsections (a), (b), (c), (d), and (f), of section 1 of Executive order 12959

250    SANCTIONING IRAN

are hereby revoked with respect to transactions occurring after the effective date of this order. The revocation of those provisions shall not alter their applicability to any transaction or violation occurring before the effective date of this order, nor shall it affect the applicability of any rule, regulation, order, license, or other form of administrative action previously taken pursuant to Executive Orders 12613 or 12959.

**Section 8.** Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Section 9.** The measures taken pursuant to this order are in response to actions of the Government of Iran occurring after the conclusion of the 1981 Algiers Accords, and are intended solely as a response to those later actions.

**Section 10.**
(a) This order is effective at 12:01am eastern daylight time on August 20, 1997

(b) This order shall be transmitted to the Congress and published in the Federal Register.

William J. Clinton
The White House
August 19, 1997

---

# DOCUMENT 8

# Amendment to the Iranian Transactions Regulations
# (31 March 1999)

Office of Foreign Assets Control
31 CFR Part 560
Implementation of Executive Order 13059

## Subpart B – Prohibitions

| | |
|---|---|
| 560.201 | Prohibited importation of goods or services from Iran. |
| 560.204 | Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran. |
| 560.205 | Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons; exceptions. |
| 560.206 | Prohibited trade-related transactions with Iran; goods, technology, or services. |
| 560.207 | Prohibited investment. |
| 560.208 | Prohibited facilitation by United States persons of transactions by foreign persons. |
| 560.210 | Exempt transactions. |

560.516 Payment and United States dollar clearing transactions involving Iran.
560.523 Exportation of equipment and services relating to information and informational materials.
560.529 Bunkering and emergency repairs.

### Appendix to Part 560 – Financial Institutions Determined to be Owned or Controlled by the Government of Iran

1. The authority citation continues to read as follows:
Authority: 3 U.S.C. 301; 18 U.S.C. 2332d; 22 U.S.C. 2349aa-9; 31 U.S.C. 321(b); 50 U.S.C. 1601-1651, 1701-1706; Pub. L 101-410, 104 Stat. 890 (28 U.S.C. 2461 note); E.O. 12613, 52 FR 41940, 3 CFR, 1987 Comp., p. 256; E.O 12957, 60 FR 14615, 3 CFR, 1995 Comp., p.332; E.O. 12959, 60 FR 24757, 3 CFR, 1995 Comp. P. 356; E.O. 13059, 62 FR 4531, 3 CFR, 1997 Comp, P.217.

### Subpart B – Prohibitions

2. Section 560.201 is revised to read as follows:

**§560.201 Prohibited importation of goods or services from Iran**
Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran, other than information and informational materials within the meaning of section 203(b)(3) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b)(3)), is prohibited.

3. Section 560.204 is revised to read as follows:

**§560.204 Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran**
Except as otherwise authorized pursuant to this part, including §560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the

---

### Subpart C – Definitions

560.301 Effective date.
560.306 Iranian-origin goods or services; Goods or services owned or controlled by the Government of Iran.
560.308 Importation of goods.
560.315 Information and informational materials.
560.318 [Removed and Reserved ]
560.319 United States depository institution.

### Subpart D – Interpretations

560.403 Transhipment through Iran.
560.406 Transhipment or transit through United States prohibited.
560.410 Exportation, reexportation, sale or supply of services.
560.411 [Removed and Reserved]
560.412 Extensions of credit or loans to Iran.
560.414 Reexportation of certain U.S.-origin goods exported prior to May 7, 1995.
560.416 Brokering services.
560.417 Facilitation; change of policies and procedures; referral of business opportunities offshore.
560.418 Release of technology or software in the United States or a third country.
560.419 U.S. employment of persons normally located in Iran.
560.420 Reexportation by non-U.S. persons of certain foreign made products containing U.S.-origin goods or technology.

### Subpart E – Licenses, Authorizations and Statements of Licensing Policy

560.501 Effect of license or authorization.
560.505 Importation of certain Iranian-origin services authorized; activities related to certain visa categories authorized.
560.506 Importation and exportation of certain gifts authorized.
560.509 Certain transactions related to patents, trademarks and copyrights authorized.
560.511 Exportation or supply of insubstantial United States content for use in foreign-made products or technology.
560.515 30-day delayed effective date for pre-May 7, 1995 trade contracts involving Iran.

268   SANCTIONING IRAN

(1) If the pre-existing trade contract is for an exportation of goods or technology from the United States that was authorized pursuant to Federal regulations in force immediately prior to May 6, 1995, the goods or technology must be exported from the United States prior to 12:01 a.m. Eastern Daylight Time, June 6, 1995, and all other activity by U.S. persons that is necessary and incidental to the performance of the pre-existing trade contract (other than payment under a financing contract) must be completed prior to 12:01a.m. Eastern Daylight Time, August 6, 1995.

(2) All obligations under a pre-existing trade contract (other than payment under a financing contract) must be fully completed prior to 12:01 a.m. Eastern Daylight Time, June 6, 1995, if the pre-existing trade contract is one for the following:

(i) The exportation of services from the United States benefiting a person in Iran or the Government of Iran;

(ii) The reexportation of goods or technology to Iran, the Government of Iran, or an entity owned or controlled by the Government of Iran that was authorized pursuant to Federal regulations in force immediately prior to May 6, 1995; or

(iii) Transactions relating to goods or services of Iranian origin or owned or controlled by the Government of Iran other than transactions relating to importation into the United States of such goods or services.

32. Section 560.516 is amended by revising paragraphs (a)(3), (a)(4) and (b) to read as follows:

§560.516 Payment and United States dollar clearing transactions involving Iran

(3) The transfer arises from an underlying transaction that is not prohibited by this part, such as a non-commercial remittance to or from Iran (e.g. a family remittance not related to a family-owned enterprise); a U.S. related commercial transfer not prohibited by this part (see e.g. §560.515(b)); or a third-country transaction not prohibited by this part; or

(4) The transfer arises from an underlying transaction that is exempted from regulation pursuant to §203 (b) of the International Economic Powers Act (50 U.S.C 1702(b)), such as an exportation to Iran or importation from Iran of information and informational materials, a

travel-related remittance, or payment for the shipment of a donation of articles to relieve human suffering.

(b) Before a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, the United States depository institution must determine that the underlying transaction is not prohibited by this part.

33. Section 560.523 is revised to read as follows:

§560.523 Exportation of equipment and services relating to information and informational materials

Specific licenses may be issued on a case-by-case basis for the exportation of equipment and services necessary for the establishment of news wire feeds or other transmissions of information and informational materials.

34. Section 560.529 is added to subpart E to read as follows:

§560.529 Bunkering and emergency repairs

Goods or services provided in the United States to a non-Iranian carrier transporting passengers or goods to or from Iran are permissible if they are:

(a) Bunkers or bunkering services;

(b) Supplied or performed in the course of emergency repairs; or

(c) Supplied or performed under circumstances which could not be anticipated prior to the carrier's departure for the United States.

35. An appendix to this part is added at the end thereof to read as follows:

Appendix to Part 560 – Financial Institutions Determined to be Owned or Controlled by the Government of Iran

This appendix lists financial institutions determined by the Office of Foreign Assets Control to be entities owned or controlled by the Government of Iran within the meaning of §560.313. The names and addresses represent the most complete list available at this time. Unless otherwise indicated, the financial institutions listed below are considered to be entities owned or controlled by the Government of Iran when they operate not only from the locations listed below, but also from any other location. The names and addresses are subject to change, and the Office of Foreign Assets Control will update the list as needed.

Case 1:16-cv-07078-ILG-RLM   Document 90-1   Filed 10/07/16   Page 59 of 61 PageID #: 1191

1. AGRICULTURAL COOPERATIVE BANK OF IRAN (a.k.a. BANK TAAVON KESHAVARZI IRAN). No129 Patrice Lumumba Street, Jalal-Al-Ahmad Expressway, P.O. Box 14155/6395, Tehran, Iran.

2. AGRICULTURAL DEVELOPMENT BANK OF IRAN (a.k.a. BANK TOSIAIYI KESHAHVARZI), Farahzad Expressway, Tehran, Iran.

3. BANK TOSIAIYI KESHAHVARZI (a.k.a. AGRICULTURAL DEVELOPMENT BANK OF IRAN) Farahzad Expressway, Tehran, Iran

4. BANK MARKAZI JOMHOURI ISLAMI IRAN (a.k.a. THE CENTRAL BANK OF IRAN), Ferdowsi Avenue, P.O. Box 11365-8551, Tehran, Iran

5. BANK MASKAN (a.k.a. HOUSING BANK (of Iran)), Ferdowsi St. Tehran, Iran

6. BANK MELLAT, Park Shahr, Varzesh Avenue, P.O. Box 11365/5964, Tehran, Iran, and all offices worldwide, including , but not limited to:

   a. BANK MELLATi (Branch), Ziya Gokalp Bulvari No. 12, Kizilay, Ankara, Turkey

   b. BANK MELLAT (Branch), Binbir Cicek Sokak, Buyukdere Caddesi, P.O. Box 67, Levant, Instabul, Turkey

   c. BANK MELLAT (Branch), 48 Gresham Street, London EC2V 7AX, England

7. BANK MELLI, P.O. Box 11365-171, Ferdowsi Avenue, Tehran, Iran, and all offices worldwide, including but not limited to:

   a. BANK MELLI (Branch), 4 Moorgate, London EC2R 6AL, England

   b. BANK MELLI (Branch), Schadowplatz 12, 4000 Dusseldorf 1, Germany

   c. BANK MELLI (Branch), Friedenstrasse 4, P.O. Box 160 154, 6000 Frankfurt am Main, Germany

   d. BANK MELLI (Branch), P.O. Box 112129, Holzbruecke 2, 2000 Hamburg 11, Germany

   e. BANK MELLI (Branch), Odeonsplatz 18, 8000 Munich 22, Germany

   f. BANK MELLI (Branch), 43 Avenue Montaigne, 75008 Paris, France

   g. BANK MELLI (Branch), 601 Gloucester Tower, The Landmark, 11 Pedder Street, P.O. Box 720, Hong Kong

   h. BANK MELLI (Representative Office), 333 New Tokyo Building, 3-1 Marunouchi, 3-chome, Chiyoda-ku, Tokyo, Japan

   i. BANK MELLI (Representative Office), 818 Wilshire Boulevard, Los Angeles, California 90017, U.S.A

   j. BANK MELLI (Representative Office), 767 Fifth Avenue, 44th Floor, New York, New York 10153, U.S.A

   k. BANK MELLI (Representative Office) Smolensky Boulevard 22/14, Kv. S., Moscow, Russia

   l. BANK MELLI (Branch), Flat No. 1, First Floor, 8 Al Sad El-Aali, Dokki, P.O. Box 2654, Cairo, Egypt

   m. BANK MELLI (Branch), Ben Yas Street, P.O. Box No. 1894, Riga Deira, Dubai, U.A.E.

   n. BANK MELLI (Branch), P.O. Box 2656, Shaikha Maryam Building, Liwa Street, Abu Dhabi, U.A.E.

   o. BANK MELLI (Branch) P.O. Box 1888, Clock Tower, Industrial Road, Al Ain Club Building in from Emeriel Al Ain, Al Ain, Abu Dhabi, U.A.E.

   p. BANK MELLI (Branch), P.O. Box 1894, Riga, Ban Yas Street, Deira, Dubai, U.A.E

   q. BANK MELLI (Branch), Mohd-Habib Building, Al-Fahidi Street, P.O. Box 3093, Bur Dubai, Dubai, U.A.E.

   r. BANK MELLI (Branch) , P.O. Box 248, Fujairah, U.A.E.

   s. BANK MELLI (Branch), Sami Sagar Building Oman Street A-Nakheel, P.O. Box 5270, Ras-Al Khaimah, U.A.E

   t. BANK MELLI (Branch), P.O. Box 459, Al Bory Street, Sharjah, U.A.E

   u. BANK MELLI (Branch), P.O. Box 785, Government Road, ShaiK Mubarak Building, Manama, Bahrain

   v. BANK MELLI (Branch), P.O. Box 23309, Shaikh Salman Street, Road No. 1129, Muharraq 211, Bahrain

   w. BANK MELLI (Branch), P.O. Box 5643, Mossa Abdul Rehman Hassan Building, 238 Al Burj St., Ruwi, Muscat, Oman

8. BANK OF INDUSTRY AND MINE (of Iran) (a.k.a BANK SANAT VA MADAN), Hafez Avenue, P.O. Box 11365/4978, Tehran, Iran

9. BANK REFAH KARGARAN (a.k.a. WORKERS WELFARE BANK (of Iran), Moffettah No. 125, P.O. Box 15815 1866, Tehran, Iran

10. BANK SADERAT IRAN, Bank Saderat Tower, P.O. Box 15745-631, Somayeh Street, Tehran, Iran, and all offices worldwide, including, but not limited to:

   a. BANK SADERAT IRAN (Branch), Hamdam Street, Airport Road Intersection, P.O. Box 700, Abu Dhabi, U.A.E.

   b. BANK SADERAT IRAN (Branch), Al-Am Road, P.O. Box 1140, Al Eim Abu Dhabi, U.A.E.

   c. BANK SADERAT IRAN (Branch), Liwara Street, P.O. Box 16, Ajman, U.A.E.

   d. BANK SADERAT IRAN (Branch), 3rd Floor Dom Dasaf Building, Mejloka Street 7A, Ashkhabad, Turkmenistan

   e. BANK SADERAT IRAN (Branch), 25–29 Panepistimiou Street, P.O. Box 4308, GR-10210, Athens 10672, Greece

f. BANK SADERAT IRAN (Branch), Imam Ali Street, Sahat Yaghi, Ras Elain-Alektisad Building 2ND Floor, Baalbeck, Lebanon

g. BANK SADERAT IRAN (Branch and Offshore Banking Unit), 106 Government Road, P.O. Box 825, Manama Town 316, Bahrain

h. BANK SADERAT IRAN (Branch), Hamra Pavilion Street, Savvagh and Daaboul Building 1ST floor, P.O. Box 113-6717, Beirut, Lebanon

i. BANK SADERAT IRAN (Branch), Alghobairi Boulevard, Beirut, Lebanon

j. BANK SADERAT IRAN (Branch), 28 Sherif Street, P.O. Box 462, Cairo, Egypt

k. BANK SADERAT IRAN (Branch), Old Ben-Ghanem Street (next to God Market), P.O. Box 2256, Doha, Qatar.

l. BANK SADERAT IRAN (Branch), Almaktoum Road, P.O. Box 4182, Deira, Dubai, U.A.E.

m. BANK SADERAT IRAN (Branch), Bazar Murshid, P.O. Box 4182, Deira, Dubai, U.A.E.

n. BANK SADERAT IRAN (Branch), Alfahid Road, P.O. Box 4182, Bur Dubai, Dubai, U.A.E.

o. BANK SADERAT IRAN (Branch), Sherea Shekikh Zayad Street, P.O. Box 55, Fujairah, U.A.E.

p. BANK SADERAT IRAN (Branch), Wilhelm Leuschner Strasse 41, P.O. Box 160151, W-6000 Frankfurt am Main, Germany

q. BANK SADERAT IRAN (Branch), P.O. Box 112227, Hopfenhof Passage, Kleiner Bustah 6-10, W-2000 Hamburg 11, Germany

r. BANK SADERAT IRAN (Branch), Lothbury, London EC2R 7HD, England

s. BANK SADERAT IRAN (Representative Office), 707 Wilshire Boulevard, Suite 4880, Los Angeles, California 90017, U.S.A.

t. BANK SADERAT IRAN (Representative Office), 55 East 59th Street, 16th Floor, New York, New York 10022, U.S.A.

u. BANK SADERAT IRAN (Branch), P.O. Box 4269, Mutrah, Muscat, Oman

v. BANK SADERAT IRAN (Branch), 16 Rue de la Paix, Paris 2eme, 75002 Paris, France

w. BANK SADERAT IRAN (Branch), Alaroba Road, P.O. Box 316, Sharjah, U.A.E.

11. BANK SANAT VA MADAN (a.k.a. BANK OF INDUSTRY AND MINE (of Iran)), Hafez Avenue, P.O. Box 11365/4978, Tehran, Iran

12. BANK SEPAH, Emam Khomeini Square, P.O. Box 11364, Tehran, Iran, and all offices worldwide, including, but not limited to:

a. BANK SEPAH (Branch), Muenchener Strasse 49, P.O. Box 10 03 47, W-6000 Frankfurt am main 1, Germany

b. BANK SEPAH (Branch), 5/7 Eastcheap, EC3M 1JT London, England

c. BANK SEPAH (Representative Office), 650 Fifth Avenue, New York, New York 10019, U.S.A.

d. BANK SEPAH (Branch), 17 Place Vendome, 75001 Paris, France

e. BANK SEPAH (Branch), Via Barberini 50, 00187 Rome, Italy

f. BANK SEPAH (Representative Office) Ufficio di Rappresentan Za, Via Ugo Foscolo 1, 20121 Milan, Italy

13. BANK TAAVON KESHAVARZI IRAN (a.k.a. AGRICULTURAL COOPERATIVE BANK OF IRAN) No. 129 Patrice Lumumba Street, Jalal-Al-Ahmad Expressway, P.O. Box 14155/6395, Tehran, Iran

14. BANK TEJARAT, 130 Taleghani Avenue, Nejatoullahie, P.O. Box 11365-5416, Tehran, Iran, and all offices worldwide, including, but not limited to:

a. BANK TEJARAT (Branch), 6/8 Clements Lane, London EC4N 7AP, England

b. BANK TEJARAT (Branch), 44 Avenue des Champs Elysees, 75008 Paris, France

15. DEUTSCH-IRANISCHE HANDELSBANK AG (n.a.k.a. EUROPAEISCH-IRANISCHE HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany, and all offices worldwide, including, but not limited to:

a. DEUTSH-IRANISCHE HANDELSBANK AG (n.a.k.a. EUROPAEISCH-IRANIS-CHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihaghi Bulvard, P.O. Box 15815/1787, Tehran 15148, Iran

16. EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany, and all offices worldwide, including, but not limited to:

a. EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihaghi Bulvard, P.O. Box 15815/1787, Tehran 15148, Iran

17. HOUSING BANK (of Iran) (a.k.a. BANK MASKAN), Ferdowsi St., Tehran, Iran

18. IRAN OVERSEAS INVESTMENT BANK LIMITED (f.k.a. IRAN OVERSEAS INVESTMENT CORPORATION LIMITED), 120 Moorgate, London EC2M 6TS, England, and all offices worldwide, including, but not limited to:

a. IRAN OVERSEAS INVESTMENT BANK LIMITED (Representative Office), 1137 Avenue Vali Asr off Park-e-SA11, P.O. Box 15115/531, Tehran, Iran

b. IRAN OVERSEAS INVESTMENT BANK LIMITED (Agency), Suite 3c, Olympia House, 61/63 Dame Street, Dublin 2, Ireland

# INDEX

AAF (company) 377
Abdi, Abbas 21
Abu Musa, Island of 14
Acharnians (Aristophanes) 25
Achille Lauro incident 367
Ackerman, Gary 403
Act to Expedite the Strength-ening of National Defense (1940) 37-8
ad-Din Shah, Mozafar 5
Adath Yisrael Synagogue, Washington DC 178
Administrative Procedures Act 41
advanced conventional weapons, definition of 175
AECA (Arms Export Control Act) 66, 99, 171, 176, 186-7, 400
AEG-Kanis Turbinenfabrik GmbH 378
AEOI (Atomic Energy Organization of Iran) 106-7, 134, 136, 407
Afghanistan 28, 44, 77
Agip (company) 299
Agricultural and Food Act (1981) 44
agricultural commodities 198-9, 207-8, 235
bulk 275-6, 277, 278-80, 282-3, 286-7
Agricultural Cooperative Bank of Iran 270
Agricultural Development Bank of Iran 270
agricultural embargo pro-tection 44
agricultural grants 154
Ahmad, Shah of Persia 6
AIPAC (American Israel Public Affairs Committee) 166, 178, 186, 187-90, 306-7, 309-12, 333
aircraft
Iran Air 373-4, 413
Arab League 50, 187
Pan Am Flight 103, 296, 309, 310, 320
sabotage of 368, 390
safety of 238
TWA flight 800 310

Al-Ahram (newspaper) 325
Al-Wafd (newspaper) 325
Albania 26
Albright, Madeleine 330-1, 400
Algeria, see Algiers Declaration
Algerian Central Bank 94-5, 109-10, 111, 119-20, 121-4
Technical Agreement 125-30
Algiers, meeting in (1979) 21
Algiers Declaration 86, 91-5; 108-10, 135
implementation of 96-101
All Fall Down (Sick) 1
American Association of Retired People (AARP) 177
American Electronics Association (AEA) 50
American Israel Public Affairs Committee, see AIPAC
American Jewish Congress 313
American Law Institute 368-9
American President Lines Ltd v China Mutual Trading Co. Ltd 380
American-Spanish War 37
Amnesty International 17
Amoli/abhi, Reza 407
ancient Greece 25
Andreyev, Vladimir 324
Anglo-Iran Oil Company (AIOC) 9
anti-boycott laws 311-12, 327-8
Anti-Terrorism and Effective Death Penalty Act (1996) 399
anti-terrorism controls 154-7
apartheid 31, 186, 366
Arab-Israeli peace process 405-6
Arab-Israeli War (1973) 14
Arab League 50, 187
boycott by 311-12, 328
Arafat, Yasser 177
Archer, Bill 302, 303, 306, 320
Aristophanes 25

arms control sanctions
Arms Export Control Act 66, 99, 171, 176, 186-7, 400
chemical and biological 48, 52, 154-5, 161, 171, 314, 400
Export Administration Act 37
Iran-Iraq Non-proliferation Act (1992) 164, 171-6, 187, 398
Iran Missile Proliferation Sanctions Act 332-3, 335
and South Africa 28
validated licences for 154, 162
Wassenaar Arrangement 51, 52
Arms Export Control Act, see AECA
arms purchases 14
Article 16 of League of Nations 28
Article 39 of UN Charter 27
Article 41 of UN Charter 27-8
Atomic Energy Organization of Iran, see AEOI
Australia 315, 320
Australian Group (AG) 165
Automobiles Berliet SA 383-4
Axworthy, Lloyd 323
Azerbaijan 8, 183, 193

baggage, accompanied 159, 226, 236, 257
Bahaism 334
Baker Hughes Incorporated 181
Baker Oil Tools 377
Bakhtiar, Shahpour 19, 20
balance of payments crisis (1971) 11
ballistic missiles 333
Baltic State Technical University 334-l
Bandar Abbas, port of 71
Bani-Sadr, Abolhassan 22, 67, 91, 404
Bank Tejarat 273
Bank Tosiatyi Keshahvarzi 270

Bank Markazi Iran, see Central Bank of Iran
Bank Maskan 270
Bank Mellat 270
Bank Melli Iran 270-1, 383
Bank of England 99, 121-4
Technical Agreement 400
Bank of Industry and Mine 271
Bank Refah Kargaran 271
Bank Saderat Iran 271-2
Bank Sanat va Madan 272
Bank Sepah 272-3
Bank Taavon Keshavarzi Iran 273
Bankers Association for Foreign Trade (BAFT) 302
Bankers Trust Company of New York 383
banks and banking
credit 220, 223, 260, 286, 287, 291, 297, 410
depository institutions 221, 232-3, 259, 268-9, 286, 317
domestic transactions 55-6
escrow 125-30
Iran and Libya Sanctions Act 305-6, 307, 316-17, 342
Iran Oil Sanction Act 290-1
letters of credit 217
loans 220, 223, 228, 260, 291, 297, 302, 316, 342
owned or controlled by Iranian government 269-74
prohibitions 215
services 200-1
Banque Centrale d'Algerie, see Algerian Central Bank
Barshefsky Charlene 328
Ba'th Party 168
Battle, Laurie 39
Baum, Philip 313
Bazargan, Prime Minister Mehdi 20-1
Bennet, Senator 293
Benouat, Lakhdar 130
Bereuter, Representative Doug 300
Berger, Sandy 178
Berlin blockade (June 1948) 39
Berman, Representative Howard 163, 293, 294
Bessekhouad, Mohamed 130

Biological Disarmament Convention (1972) 161
Black, Justice 137
Black's Law Dictionary 368
Blair, Tony 330
Blakesley, Professor Christopher 361-2, 364, 365, 368
Blix, Director General Hans 407
Bond, Christopher 403
bonded warehouses 222, 244
"Boston tea party" (1774) 25
Brazil 320
Britain
Anglo-Iranian Oil Company 9
and Cuban Democracy Act 385
historical links with Iran 5, 6
and Iran hostage crisis 71, 83
and opposition to ILSA 321-2
role in overthrow of Mossadegh 11
and Siberian pipeline con-troversy 376-7
use of sanctions 29
withdrawal from Persian Gulf (1971) 168
Brittan, Sir Leon 320-1, 324, 329
brokering services 261, 281, 286-7
Brownback, Sam 332
Bryce, James 131
Brzezinski, Zbigniew 19, 21, 179
Bulgaria 26
bulk agricultural commo-dities 275-6, 277, 278-80, 282-3, 286-7
bunkering 309
list of eligible 282-3
Bureau of Economic and Business Affairs 318
Bureau of Export Administration (BXA) 50-1, 262
Burma 412
Burns, Nicholas 325
Burton, Representative Dan 295, 386
Bush, President George 48, 49, 164, 385
Bushehr nuclear reactors, Iran 406-7

Caltex 440
Campbell, Senator 293
Canada 203-5, 304, 323, 365, 385, 386-7, 409
Carbo, Joseph Coll 1, 324
Carswell, Robert 72
Carter, Barry E. 24
Carter, President Jimmy and Dames & Moore v Regan case 139-45
during Iran hostage crisis 66, 67, 75, 397
and EAA embargoes 43, 44
end to litigation 54
Executive Order 12170 68-70, 87
Executive Order 12205 77-9, 86-7
Executive Order 12211 79-82
Executive Orders 12276-12285 95, 96, 98
failure to consult Congress 53
Hostage Settlement Agreement 86
and human rights in Iran 17
statement of freeze regu-lations 107
and Shah of Iran 2, 21
Caspian Sea 193
Castro, Fidel 31, 384, 386
Central Bank of Iran, The 68-9, 94, 119-20, 121-4, 270, 274
Centre for Strategic and International Studies (CSIS) 412-3
Charette, Hervé de 323
Chas T. Main International Inc. v United States 105
chemical and biological weapons 48, 154-5, 161, 314
Chemical and Biological Weapons Control and Warfare Elimination Act (1991) 171, 400
chemical exports, 160-2
Chemical Weapons Convention (CWC) 52
Cheney, Richard B. 30, 188
China, People's Republic of 35, 39, 42, 48, 53, 96, 320, 321, 324, 383, 386
Chirac, President Jacques 321, 323
Chretien, Prime Minister Jean 288